In re Webb.
In re Estate of Webb.
Webb, Appellee, *v.* Webb, Appellant.

[Cite as In re Webb, 18 Ohio App. 2d 287.]

(Nos. 28998, 28999 and 29000—Decided June 19, 1969.)

Messrs. *Thompson, Hine & Flory*, Mr. *William D. Ginn* and Mr. *Michael M. Hughes*, for appellee Marilyn R. Webb, executrix.

Messrs. *Forrester & Kovanda*, for appellant Hazel M. Webb, as guardian and administratrix.

Mr. *James H. Nacey* and Messrs. *Rippner, Schwartz, Carlin & Weiss*, for appellant Hazel M. Webb, individually.

SILBERT, C. J. These are appeals on questions of law from a judgment of the Probate Court of Cuyahoga County, after consolidation therein of three separate cases. The cases were all heard together in this court, the legal issues being identical in each.

Decedent, George Acil Webb (hereinafter called George), a widower, had a savings account, containing a substantial sum of money, in his own name. In May 1953, he converted this account to a joint and survivorship account, with the only other name thereon being that of his son, George William Webb (hereinafter called G. William).

On September 30, 1958, George married. His wife, Hazel Webb Meermans, is the appellant herein.

On February 2, 1960, George closed out the joint and survivorship account which he had maintained with his son, and redeposited the entire sum in a new joint and survivorship account with Hazel, his wife. G. William offered no protest or opposition to George's action.

Subsequently, over a period of approximately eleven months, both George and Hazel made withdrawals from that account, 16 being made by George, 18 by Hazel. During this period, no deposits were made by either of them.

(On February 22, 1960, George withdrew $2,000, which he gave to his son, G. William, who in turn executed a promissory note in that amount payable to George.)

On January 4 and January 10, 1961, Hazel met with Thomas Clark, attorney for G. William, and discussed the mental deterioration of George.

On January 16, 1961, Dr. John H. Budd, George's personal physician, conducted an examination of George, and concluded that he was suffering from cerebral arteriosclerosis and that his mental condition was infirm as a result thereof. Hazel was present at the examination. She had called George's mental deterioration to the attention of Dr. Budd.

Eight days after the examination, on January 24, 1961, Hazel closed out the joint account. She opened a new account in her name only, into which she deposited the entire balance of $49,948.45.

On March 6, 1961, George's son, G. William Webb, filed an application in the Probate Court of Cuyahoga County, seeking to be appointed his father's guardian. In support of his application, G. William filed a letter from Dr. Budd reciting his professional opinion resulting from the January 16 examination of George.

On April 4, 1961, Hazel also filed an application for appointment as George's guardian.

The joint bank account (by then closed) was listed in G. William's application as being an asset of George's; Hazel's application did not list that account, which she then deemed to be her exclusive property.

Hazel was appointed George's guardian on April 7, 1961. The court ordered bond in the amount of $15,000.

George died intestate on April 23, 1961, and Hazel was appointed his administratrix on May 9. His sole heirs at law were his widow, Hazel Webb, and his son, George William Webb.

G. William Webb, George's son, filed three separate causes of action. The first two involved exceptions to the guardian's and administratrix's accounts, respectively; and the third was a petition for declaratory judgment. The

three matters were heard together by a referee of the Probate Court. The referee ruled that Hazel had been entitled to withdraw the entire balance of the joint account, and that the new account which she opened, and the entire sum therein, was properly omitted from her accounts both as George's guardian and as administratrix of his estate.

G. William then appealed to the Probate Court which held that Hazel was not entitled to any of the funds withdrawn on January 24, 1961, and that the total should have been included in both inventories. The Probate Court viewed Hazel's action in withdrawing that amount as a conversion and ordered her to account to the Probate Court for the total sum. The opinion of the Probate Court appears in 13 Ohio Misc. 1. G. William Webb having become deceased, plaintiff-appellee in these cases is Marilyn R. Webb, executrix of his estate.

Appellant, Hazel Webb, urges three assignments of error. First, she claims that the Probate Court erred in holding that the account between George and Hazel was created for the convenience of George Webb. Appellant contends that the best evidence of George's intent was the signature card which he signed with the bank, and that there is no evidence tending to support the finding that this was a "convenience" account. The first contention is in contravention of the established law of this state, and the second is refuted by the record.

Second, appellant claims error in holding that Hazel had the burden of proof to show that she did not unduly influence George when he opened the account. A careful reading of the opinion of the Probate Court discloses nothing indicating that the court made any such holding. The court merely stated that Hazel had the burden of supporting her claim that George had made a completed gift to her, and that she "utterly failed" to advance any evidence for this purpose.

Third, appellant claims error "in holding that the subsequent incompetency of the decedent, George Webb, terminated the contract of deposit and destroyed the vested survivorship rights of the appellant, Hazel Webb."

It is apparent that, insofar as the question of the co-depositor's ownership rights in the joint account are concerned, there is no general rule which can guide us in this case. However, it is well established that, whatever rights the guardian may have in such account, they are limited merely to whatever is deemed necessary for the support of the ward. Annotation—Joint Depositor—Incompetency—Effect—62 A. L. R. 2d 1091 (1958).

In *Abrams* v. *Nickel* (1935), 50 Ohio App. 500, the Hamilton County Court of Appeals dealt with a joint and survivorship account between a man and a woman who were not related to one another. *Both* had contributed to the account, the man having been the major contributor. The woman was adjudicated incompetent, and the codepositor then withdrew a large portion of the funds, redepositing it in his own name. The woman's guardian then filed suit, seeking an accounting, a declaration of trust, and an injunction against further withdrawals from the account. In its syllabus, the court stated:

"The adjudication of lunacy and appointment of a guardian of one of the two parties to a joint and survivorship account terminates the agreement, and as each had a complete interest in the entire account, equity requires, in the absence of extraordinary circumstances, an equal division of the account between the parties involved as of the time the guardian was appointed."

Seven years later, this court decided the case of *Ulmer* v. *Society for Savings*, 35 Ohio Law Abs. 525, wherein the codepositors were husband and wife, *the husband* having been the *sole* contributor. *The wife* was adjudicated an incompetent, and her guardian sought a division of the joint account. The *Abrams case* was considered, and the "equal division" reasoning thereof was rejected, at least where the codepositors are husband and wife:

"In this case there is an attempt to divide the fund while both parties are living. When this is undertaken opportunity should be given to prove just what interest each actually has in the funds. When it is determined to be advisable that the joint and survivorship account should be terminated, it would seem to be more equitable that each

should be entitled to such funds as was [sic] placed in the account by each party thereto rather than arbitrarily divided in two equal parts, unless a gift was intended as shown by proof."

It should be noted that in *Abrams* there were two codepositors, both having contributed substantial amounts to a joint and survivorship account, the two being unrelated to each other and under no obligation to support one another. It was merely held in that case that the adjudication of one of them as an incompetent terminated the account. The reasoning was that since the incompetent "ceased to have any authority over the account" from the date of the guardianship, and since "the guardian could not become a joint owner of the account" with the competent codepositor, the "unforeseen contingency" of the codepositor's incompetency automatically terminated the original arrangement between the codepositors. Said the court, "The evidence is not convincing that any special reason exists for departing from a normal division of the balance at the time of the appointment of the guardian."

The factual differences in the *Ulmer case* are highly significant. There, the competent codepositor had been the *sole contributor* to the account. Further, he was under a separate legal obligation to support the incompetent codepositor, who was his wife. Thus, a division of the account, throwing half the funds therein into her estate, would have resulted in an injustice. Yet, there is one fact in *Ulmer* which tends to support the reasoning of the *Abrams case*: the husband had been the sole contributor to the account. This fact served as the legal basis for prohibiting an equal division with the estate of the incompetent wife. The fact that the husband had an independent duty to support his wife was an equitable factor further showing that the wife was not likely to be prejudiced by the court's decision, *but the decision itself was based on the question of who had contributed to the account.* The *Ulmer case* stated the rule later set down in the case of *Union Properties, Inc.. v. Cleveland Trust Co.* (1949), 152 Ohio St. 430, that the

"realities of ownership" may be shown in a dispute over a division of the funds of a joint and survivorship account, when such dispute occurs during the joint lives of the depositors.

Thus, had Hazel, the competent codepositor in the case now before us, refrained from closing the account until after George was adjudicated incompetent, and had the question of the disposition of the account been brought before this court, we would be compelled to take into account the fact that George was the sole contributor to the account. That fact, together with the other "realities of ownership" of the account, would then militate even against an equal division of the funds therein, much less an award to Hazel of the whole. For this case to compare factually with the *Ulmer case*, Hazel would have had to have contributed the entire amount in the account. In reality, she contributed not a penny.

It is settled that the establishment of a joint and survivorship account generally vests in the joint depositors of such an account a right of survivorship in the entire balance of funds in the account. Such right vests by contract immediately upon the formation of the account, although it is at that time an inchoate right. *Sage* v. *Flueck* (1937), 132 Ohio St. 377. However, as pointed out in the *Abrams* and *Ulmer cases*, the entire contract is terminated upon the adjudication of a codepositor as an incompetent. Thus, such adjudication gives rise to a requirement of a determination of rights in a joint and survivorship account, for the rights vested by such account cannot survive under a contract which is automatically nullified.

However, the most basic question confronting us is as follows: Did Hazel have the right to make a complete withdrawal of all funds during George's lifetime? Even disregarding the fact of George's incompetency, it is clear that she did not have such a right. In *Fecteau* v. *Cleveland Trust Co.* (1960), 171 Ohio St. 121, 124-125, the Supreme Court said:

"Under the Ohio rule the creation of a joint and survivorship bank account is a contractual matter, and, where

a contest arises as to the ownership of funds in an account, carried in the joint names of two people, and one of them has wholly withdrawn and appropriated such funds to his own use, *such case is to be decided on its own facts. The form of the deposit is not conclusive, and the circumstance that by the terms of the deposit either person may with-. draw the whole amount is not always dispositive of the issue of ownership.*

''The real intent of the parties is often a question of fact, and *evidence may be admitted to show that intent,* even where by signature card or in some other way a joint account has apparently been established. See 7 Ohio Jurisprudence (2d), 253, Section 120 *et seq.,* and 7 American Jurisprudence, 299, Section 425 *et seq.''* (Emphasis added.)

Thus, notwithstanding that a deposit card may give a bank or savings institution the right to pay out any of or all the balance in a joint account to any of the codepositors therein, such a card is not conclusive proof of the rights and obligations of the codepositors *inter se.* In the instant case, therefore, it is proper for us to consider the facts surrounding the account between George and Hazel, in order to determine the intent of George at the time he established the account with the funds from the joint account he had previously maintained with his son, G. William Webb.

The Probate Court referee referred to the signature cards executed by George and Hazel, and, in his second conclusion of law, stated that ''Upon execution of this contract, Hazel Webb became joint owner of the fund represented by the account with attendant survivorship rights therein'' (citing *Daramus* v. *Hategan* (1965), 2 Ohio App. 2d 347). In his third conclusion of law, the referee stated, ''By the terms of said contract, Hazel M. Webb was given the complete unqualified right to draw the entire balance of the account notwithstanding the subsequent incapacity of George A. Webb.'' The *Daramus case,* decided by this court, held merely that, for a joint and survivor-

ship account to be established, there must be compliance with the rules of a savings institution. The case cited relied on *Cleveland Trust Co.* v. *Scobie* (1926), 114 Ohio St. 241, 48 A. L. R. 182, which had held that the establishment of a joint and survivorship account is valid, and that a surviving depositor has the right to withdraw all the funds in such account upon the death of the other, where "the record shows that the depositor intended to transfer to the person to whom he made the account jointly payable a present joint interest therein equal to his own." The referee's findings of fact include the findings that George did in fact execute the signature card setting up the account with Hazel and that George "was fully competent and of sound mind and was not under duress" when he executed the card, and that "the opening of said account was the voluntary act of said George A. Webb." *Nonetheless, the findings of fact contain no findings as to George's intent in setting up the account with Hazel.*

The Probate Court, however, went into the subject of the "realities of ownership" in considerable detail when it reversed the decision of the referee. The court acknowledged that Ohio case law holds that, where the rules and regulations of a savings institution are complied with, "a joint and survivorship account is created between the co-signators by contract and through that contract the creator gives to the other co-signator a present joint interest in the account equal to his own." The court then concluded that George created in Hazel a present joint interest equal to his own on February 2, 1960, when the account was opened. The court then went on to say:

"But to what extent does that present, joint and equal interest really exist? It is certainly there, but it remains always subject to the realities of ownership, as it is stated in the 1960 decision, *Fecteau* v. *Cleveland Trust Co.* , * * *, which holds:

" 'The fact that a bank account is carried in the names of two persons jointly with the right of survivorship is not always conclusive as to the ownership of the account, and, where a controversy arises as to the owner-

ship of such account, evidence is admissible in a proper case to show the true situation.' ''

The Probate Court then said, ''What is the 'true situation' in this case?'' In reviewing the history of George's bank account, the court noted that it had been originated in 1947 in George's name only; that in 1953 George converted it into a joint and survivorship account with his son, at which time the account contained a balance of $23,000; that George thereafter made various deposits and withdrawals, until, on February 2, 1960, he converted it into the account with Hazel, with a balance of $55,000. The court further noted that he converted the account in this manner ''without a murmur of protest from G. W. Webb, the record co-owner of the account.''

(It should be here noted that G. William Webb never withdrew any funds from the account when he was co-owner thereof.)

The Probate Court interpreted the facts, especially G. William's silence upon his divestiture of interest as co-owner, as ''conclusively'' showing, with regard to the joint account between George and his son, ''that George was the real owner of the funds and that G. W. Webb, the other 'co-owner,' had really only a right to make claim to the funds, should George die, and only a right to withdraw any of the funds while George was living, *should George agree.*'' (Emphasis by the Probate Court.) In its opinion, the court says:

''And this 'true situation' continued to exist and was impressed upon the new joint and survivorship account established in the names of George and Hazel Webb. George continued to be the real owner of the funds and Hazel, the other 'co-owner,' *acquired only a right to make claim to the funds should George die, and only a right to withdraw any of the funds while George was living, should George agree.*

''The joint and survivorship account in Ohio, under these circumstances then, is based upon a contract, as most authorities agree, but that contract is a continuing one, entirely dependent upon the whims of the creator and sub-

ject to divestiture of the rights of the second party at any time. The only time the second party to the joint survivorship account contract can convert the funds to his own use without the consent of the creator of the account is after the creator's death. And even that is subject to dispute.

"In terms of the instant case, then, once George, the creator of this account, the 'true' owner of all the funds, became incompetent, the second party, his wife, Hazel, no longer had the authority in law to withdraw any of the funds for her own purposes prior to George's death. * * *" (Emphasis added.)

Of significance in this case is the history of withdrawals by George and Hazel from their account. Of the total of 35 withdrawals made by both parties, 27 preceded the time (approximately the middle of November 1960) when George's incompetency manifested itself. Aside from George's withdrawal of $2,000 on February 22, 1960 (which constituted a loan to his son), the highest amount was $330.44, withdrawn by Hazel on July 22, 1960. Of comparable size was a withdrawal of $321 by Hazel in August, of which $271.20 was disbursed by a money order (showing as remitter "Geo. A. Webb") payable to "U. S. Treasury Department." Also, on April 4, 1960, George withdrew $230.44, which was the exact amount of a money order issued on that date payable to "Director of Internal Revenue," showing the remitter to be "Mrs. Geo. Webb." Thus, of these three withdrawals, two were for the purpose of paying what appears to have been their joint tax liability. The other 23 withdrawals prior to George's incompetency can be summarized as follows: one withdrawal of $300 (by George); five withdrawals at $200 each (of which three were made by George); seven at $100 (four of which by George); and ten at $50 (seven by George).

However, at the time when George's behavior began to show his deteriorating condition, Hazel increased the amount she had been withdrawing from the account. On November 15, 1960, she made a withdrawal of $500, which was larger than any single withdrawal she had yet made, and larger than any withdrawal ever made by George, except for the $2,000 loan he made to his son in February,

In the month of December 1960, she made four withdrawals totaling $1,000. In no prior month had such a total been withdrawn, except for February, when the total withdrawn was $2,150, which included the $2,000 loan. In January, she made one withdrawal of $200 and the final withdrawal closing the account, on January 24, in the sum of $49,-948.45.

The testimony of attorney Thomas E. Clark, who had formerly been associated with the firm representing George's son, G. William Webb, shows that on January 4, 1961, Hazel met with Clark in his office. Clark told Hazel that his client was concerned over George's condition. They discussed the possibility of a guardianship. Hazel, according to Clark,

"* * * acknowledged that Mr. Webb's condition had reached a point where he was very difficult to handle.

"* * *

"This is Mrs. Webb's statement to me, that her husband was very difficult to handle, that he was feeble, both mentally and physically, and had not been able for a long time to handle his affairs or his work.

"She said she had been taking him to the bank to conduct his business affairs, and that this had been working out fairly well, but she didn't know how long that he would be able, physically, to go to the bank."

Clark then related their discussions regarding the effect of a guardianship on the ownership of the bank account, and the disposition of pension checks and a monthly social security check which were received by George. Clark testified that he told Hazel that everything would be transferred to the guardian. Clark testified further that Hazel expressed some reservations about a guardianship upon learning that the procedure would involve George's being served with a notice from the Probate Court, because she feared "that he [George] would be upset and not understand the reasons for having a guardian appointed.

"Our discussion ended rather abruptly here. She told me that she would consider the matter, but she didn't think it was good for his condition to have someone appear at the house and serve a notice on Mr. Webb."

On January 10, 1961, Mrs. Webb again met with Clark. They again discussed George's condition. At that time, Hazel expressed her desire to have a guardidan appointed for George. Clark again advised Hazel that this would result in the entire amount in the savings account being included in George's estate and would effectuate an equal division thereof between Hazel and G. William, upon George's death. Hazel then asked whether there was any other manner in which the question of bank account proceeds could be handled. Clark suggested the possibility of a contract between Hazel and G. William, agreeing to an equal division between them at George's death. Hazel stated her willingness to make such a contract. According to Clark, Hazel stated that she "felt that Bill [G. William Webb] was entitled to one-half of the account. * * * She felt that an agreement with him was the best way to handle it, since as a practical matter she could handle the bills and everything by drawing on the savings account in Broadview Savings and Loan."

None of the foregoing, of course, is direct proof of George's intent with regard to the savings account with Hazel. However, it does indicate that Hazel had the understanding that her stepson "was entitled to one-half of the account." This tends to bear out the Probate Court's finding that George's arrangement with Hazel was similar to the arrangement with G. William under the previous joint account. Hazel's statement is similar to G. William's silence at the time his father closed out the account with him and converted it to a joint account with Hazel. Where only the right of survivorship is involved, the sole question which must be answered is whether George had an intent to transfer a present interest in the fund to Hazel. *In re Estate of Hatch* (1950), 154 Ohio St. 149. The *Fecteau case, supra* (171 Ohio St. 121), extended this test, beyond the mere right of survivorship, to include situations involving a right to withdraw during the joint lives of both codepositors.

Since a joint and survivorship account is not conclusive as to the contributor's intent, it follows that, where the evidence leads to the conclusion that his intent was

merely to provide for his own convenience, such intent supersedes the form of the account. *Held, Admr.,* v. *Myers* (1934), 48 Ohio App. 131.

The Probate Court in the instant case inferred from all the facts adduced by the evidence and testimony that George had not had any intention of transferring "true" ownership in the account to Hazel, except for her right of survivorship. A careful scrutiny of the record has revealed nothing which would tend to rebut this reasonable inference. Where such an inference is raised, a plaintiff seeking to establish that the sole contributing codepositor actually intended to transfer greater rights to plaintiff has the burden of showing that intent. *In re Estate of Svab* (1967), 11 Ohio St. 2d 182, 184-185.

It is clear that the statute dealing with joint and survivorship accounts *in banks* was not intended to affect the rights of the codepositors *inter se* as to title, but was enacted solely for the purpose of protecting a bank from liability for paying out funds to a codepositor. *Nichols* v. *Metropolitan Life Ins. Co.* (1941), 137 Ohio St. 542, 544; *Union Properties, Inc.,* v. *Cleveland Trust Co., supra* (152 Ohio St. 430); *Bauman* v. *Walter* (1953), 160 Ohio St. 273; *Fecteau* v. *Cleveland Trust Co., supra* (171 Ohio St. 121).

We have so held in: *In re Estate of Morgan* (1918), 28 C. C. (N. S.) 222, 223-224, 30 C. D. 101, 102 (where the statute dealt with all savings institutions); *Union Trust Co.* v. *Hutchison* (1927), 27 Ohio App. 284; and *Jones* v. *Neu* (1958), 106 Ohio App. 161, 173.

Appellant seeks to distinguish Section 1151.19, Revised Code, which deals with joint and survivorship accounts in building and loan associations, from Section 1107.08 (formerly Section 1105.09), dealing with such accounts in banks. While conceding that Section 1107.08 is not dispositive of codepositors' rights *inter se*, appellant, nonetheless, urges us to hold otherwise as to Section 1151.19.

There is no logical basis for making such a distinction. The two statutes are both concerned merely with the rights and duties flowing between a savings institution and its depositors, and with providing immunity for an institution

which pays out funds in accordance with a contract it has made with its depositors. We, therefore, apply the same rule to Section 1151.19 as is clearly applicable to Section 1107.08, and hold that Section 1151.19, Revised Code, has no bearing on the rights of codepositors, *inter se*, in a savings account with a building and loan association.

In her brief, appellant points out that the latter section provides that an account in a building and loan association is payable to a codepositor "notwithstanding the death *or incapacity*" of any of them, and that Section 1107.08 contains no reference to incapacity. Thus, she argues, *Abrams* v. *Nickel, supra* (50 Ohio App. 500), is inapplicable herein, since the court in *Abrams* based its holding on the fact that the incapacity of the codepositor constituted a contingency not foreseen when the account was first opened with the bank.

That contention would have significance were we concerned herein with the rights of a codepositor as against the building and loan association. However, we are in no way confronted with such a question. The *Abrams case* involved a joint and survivorship account to which *both* codepositors had contributed, and which both regarded as vesting equal rights in both of them. Thus, the court properly held that "each had a complete interest in the entire account." By contrast, the realities of ownership in the case now before us, as found by the Probate Court and as evinced in the record, support the conclusion that true ownership of the whole was in George alone.

The court in *Abrams* based its holding, *not* on the contract of deposit, but on the realities of ownership, and so must we. We deal here solely with the rights of the two codepositors *inter se*. Since Section 1151.19, Revised Code, has no bearing on such rights, it has no bearing on this case.

We note that both the *Abrams* and *Ulmer cases* involved the *inter vivos* rights of codepositors *after* one codepositor had been adjudicated incompetent, and that in the instant case we are concerned with such rights *prior to* such adjudication. However, we also note that Hazel

was well aware of George's deteriorated mental condition, and that her closing of the account was long after such condition had become apparent. The date of adjudication is ordinarily the date on which the codepositors' rights *inter se* terminate (to await judicial determination as to such rights). However, to make that rule universal would be to ignore the realities of a situation such as this. Once Hazel became aware of the fact that George was actually mentally incompetent to handle his own affairs, her rights diminished to those which would have existed had George already been adjudicated incompetent. Under the *Ulmer case*, not having contributed to the account, she was entitled to withdraw nothing for her own benefit, all the funds then vesting in George. Until a guardian was appointed, Hazel, as a wife under an obligation to support her husband, and as a codepositor entitled under the deposit contract to make withdrawals, could withdraw whatever was needed for George's benefit, but she could not appropriate to her own use funds the equitable title to which she did not possess. The Probate Court's finding that Hazel "converted these funds to her exclusive control," therefore, appears correct. Her knowledge as to George's incompetency, the fact that she had made no contributions to the account, and the indication of the record that George's intent was not to vest her with an *inter vivos* interest therein equal to his own, combine to make the Probate Court's finding the only reasonable one under the circumstances. Neither her contractual rights (against the savings institution) to withdraw funds on demand nor her inchoate right of survivorship could justify her act of closing the account during George's lifetime and depositing the entire amount therein in a new account in her own name.

Appellant cites *Shipman* v. *Hance* (1959), 109 Ohio App. 321, in support of her contention that her act of withdrawing the balance of the joint account prior to the death of the contributing codepositor did not divest her of her vested interest in the account.

The *Shipman case* involved physical rather than mental incapacity. The sole depositor became critically ill and

asked her mother to make arrangements with the savings association, which would permit the mother to withdraw money to pay the daughter's bills. On the advice of the secretary of the association, the mother opened a joint and survivorship account, with the daughter's acquiescence. The signature card which they both signed contained the following clause:

"For the purpose of carrying this into effect, each of the signers hereby transfers to the other or others, a present equal undivided interest in this account, and all additions thereto, for our respective lives."

(The language of the signature card signed by George and Hazel contained no such provision. It neither expressed nor implied any agreement or understanding between George and Hazel, but merely authorized the savings institution to pay funds in the account to either codepositor "both before, after and notwithstanding the death or other incapacity of any one or more of us," and acquitted the institution from liability for so doing.)

Prior to the daughter's death (in *Shipman* v. *Hance*), the mother withdrew the entire balance in a series of five withdrawals. The daughter died 9 days after the account had been closed. The mother paid all the deceased daughter's expenses and retained the remainder for herself. The executor of the daughter's estate sued to have the money included in the daughter's estate. The Miami County Court of Appeals invoked the "realities of ownership" rule and permitted the mother, as survivor, to retain ownership of the funds, this having been the intent of the daughter as well. While there is factual similarity between *Shipman* v. *Hance, supra* (109 Ohio App. 321), and the instant case, *Shipman* is clearly distinguishable both by virtue of the independent contract of the codepositors *inter se,* which was incorporated into the signature card, and the fact that the contributing codepositor was at all times mentally competent.

The Probate Court in the case before us found that George had intended that Hazel have a vested right of survivorship, but not a right to withdraw for her own

benefit during George's lifetime. A right of survivorship, although vested, cannot be exercised until one is a survivor. If a noncontributing codepositor, who has been vested only with a right of survivorship, should "anticipate" that right, withdraw all the funds, squander them, and then predecease the contributing codepositor, the latter would then be deprived of *his* right of survivorship, to the detriment of himself and of his heirs at law. The law must prevent such abuses.

It is established in Ohio that the mental incompetency of a codepositor terminates a joint and survivorship account. *Abrams* v. *Nickel, supra* (50 Ohio App. 500); *Ulmer* v. *Society for Savings, supra* (35 Ohio Law Abs. 525). Thus, had Hazel waited until after George's death, and *then* withdrawn the funds, George's estate could then have recovered the funds. Ohio case law would require that this be the result, since, once a joint and survivorship account is terminated by the mental incompetency of a codepositor, each codepositor is then "entitled to such funds as was [*sic*] placed in the account by each party thereto." *Ulmer* v. *Society for Savings, supra* (35 Ohio Law Abs. 525). Therefore, on the date of George's adjudication, the entire account should have been listed in the guardian's inventory as being George's property, and all of Hazel's rights, both under the contract of deposit and in accordance with George's intent when he established the account with Hazel, would have been terminated along with the account. She would still have, and, in fact, does have, her right of intestate succession under the laws of descent and distribution to share equally in all her deceased husband's estate, along with her stepson, G. William Webb.

Hazel's act, on January 24, 1961, of closing out the account during George's lifetime, when his mental incompetency had become manifest, clearly exceeded any vested rights exercisable at that time. By so doing, she deprived George's guardian, not yet appointed, of the ability to draw on the balance for George's benefit. It is true that Hazel ultimately was appointed his guardian, but she could not have known on January 24 that she would be

appointed, and, by closing the account, she was depriving George of *his* right to enjoy the benefits of the power of withdrawal, to his potential detriment. The Probate Court properly terms this a "conversion." Hazel's ultimate appointment as guardian could not retroactively excuse this act, for a guardian is not obligated to use his own funds to support his ward.

Nor could Hazel's obligation, as George's wife, to support her husband excuse her. George had a right to enjoy the funds in the account during his lifetime, and his right to the use of that substantial sum cannot be supplanted by the conversion of his own property to one under a general obligation of support. The statutorily-imposed obligations of a guardian must not be permitted to be thrust aside merely because a husband-wife relation exists. One who is appointed guardian of an incompetent spouse is under the same restraints and duties as is a guardian who is a complete stranger to his ward.

Section 3103.04, Revised Code (formerly Section 8002-4, General Code, analogous to Section 7998, General Code), provides that:

"Neither husband nor wife has any interest in the property of the other, except as mentioned in Section 3103.03 of the Revised Code [pertaining to the obligations of support], the right to dower, and the right to remain in the mansion house after the death of either. * * *."

Under that statute, George, or his guardian, would have had a right to maintain an action against Hazel for reimbursement to him, or his estate, of the money converted during his lifetime. *Madget* v. *Madget* (1949), 85 Ohio App. 18.

By destroying the joint and survivorship account, Hazel destroyed also her only basis for claiming a right of survivorship in the entire balance. She was legally obligated to reimburse George to the extent of the entire balance withdrawn, since she had no personal claim on it during his lifetime. Thus, even if the fact of George's incompetency had not terminated the account, Hazel's own actions would have had that result.

> Subsequent to the hearing had in this court in the instant case, counsel for both sides filed communications with us calling our attention to the very recent case of *Miller* v. *Yocum*, 18 Ohio App. 2d 52. The syllabus of the opinion in that case reads as follows:

"*Under circumstances where a surviving joint depositor would have been entitled to the balance of the account in the absence of any intervening incompetency of the decedent joint depositor,* the facts of such incompetency and the appointment of a guardian of the incompetent's estate do not, in and of themselves, destroy the survivorship rights of the surviving depositor." (Emphasis added.)

Such a statement appears to be in direct conflict with the *Abrams* and *Ulmer cases.* However, a reading of the opinion shows that the "incompetency" involved in *Miller* was merely a matter of advanced age and illness, and that the appointment of a guardian was made with the consent of the ward. Thus, there was no question of mental incompetency in *Miller,* and the appointment of the guardian was not given the same effect therein as were the appointments in *Abrams* and *Ulmer,* where mental incapacity was the basis for such appointments. In the instant case, we deal with mental incompetency. The facts in *Miller* v. *Yocum* manifestly are at such variance with those in the instant case as to make *Miller* wholly inapplicable herein.

For the foregoing reasons, the savings account balance was properly ordered by the Probate Court to be included in both the guardian's and administratrix's inventories in George's estates, as an incompetent and as a decedent. The judgment of the Probate Court is affirmed.

*Judgment affirmed.*

ARTL and CORRIGAN, JJ., concur.