GUERRA, EXECUTRIX, *v.* GUERRA ET AL.

[Cite as Guerra v. Guerra (1970), 25 Ohio Misc. 1.]

2

(No. 422—Decided May 4, 1970.)

Probate Division, Common Pleas Court of Lake County.

*Mr. Oliver W. Bates,* for plaintiff.
*Mr. Edward C. Redmond,* for defendant John Sziszak.

POLLOCK, J.   This matter is before the court on a petition for a declaratory judgment filed by Ann T. Guerra, executrix of the estate of her mother, Elizabeth Sziszak, deceased.   While Mrs. Sziszak was of sound mind she converted eight savings accounts (in three banks or savings and loan companies) which she owned individually, to joint and survivorship accounts with certain of her children and one grandson.   In each case the co-depositor appeared with her at the bank and signed the bank signature card and the bank stamped the passbook with the usual form indicating that the account then became a joint and survivorship account.   She retained the passbooks in her possession and no one other than the decedent made deposits or withdrawals from the accounts.   In addition to the above, there was one account which was converted to a ''payable on death'' account with one of her sons.   Mrs. Sziszak also

purchased U. S. Savings Bonds (Series E) during the period from 1954 to 1956 in the total face value of $13,400. These bonds were all purchased in her name with certain of her children as joint and survivor owners. Mrs. Sziszak also owned in her own name alone the two-family home where she lived and 24 shares of U. S. Steel common stock.

On February 6, 1967, Ann Guerra was appointed guardian of her mother by reason of advanced age and mental disability. The guardian's inventory listed the above accounts, bonds, shares and real estate as asests of her guardianship estate. At that time the joint and survivor accounts had a total value of $23,919.80. There was also a checking account in joint and survivor form with Ann Guerra as the co-depositor. This had been set up as a convenience account so that Ann could deposit and withdraw for her mother during a declining period of Mrs. Sziszak prior to the guardianship. It was listed in the inventory as having a value of $969.96. Soon after Ann was appointed guardian, she went with her attorney to the various banks and all of the accounts were then changed into her name as guardian of her mother's guardianship estate.

Shortly after her appointment, the guardian found that the home was rapidly deteriorating and producing little income and therefore brought a land sale proceeding. The home was sold for $6,000 and after deducting the costs of sale there remained a balance of $5,728.65. This was deposited in the guardian's checking account. The guardian then used this fund and the income arising from Social Security, dividends from the U. S. Steel stock, and rent prior to the sale of the house to pay for Mrs. Sziszak's care in a nursing home and other expenses such as bond premiums, taxes, medical bills, attorney fees and other incidental expenses. The fund from the sale of the house and current income proved insufficient to cover the expenses for Mrs. Sziszak's care and the guardian then started using funds from the various savings accounts, exhausting them one by one until three of the eight accounts were completely consumed. The other accounts remained intact together with the interest on the same until Mrs. Sziszak's death.

At that time, as shown by the final account of the guardian and the inventory of the executrix, all of the remaining accounts were combined into one saving account in the sum of $22,000 and a checking account in the sum of $1,493.30, both in the name of the executrix. This would indicate that the total joint and survivorship accounts were diminished by the sum of $1,396.43. While three accounts were exhausted the others were augmented by interest.

The decedent left a will and codicil which have been admitted to probate in which she made a specific bequest of her shares of U. S. Steel to various individuals and a specific devise of her residence, including the contents and personal effects to a son, Joseph Sziszak. Incidentally, the contents and personal effects were sold by the guardian for $141.90. The residuary clause of the will gave the entire residue of her estate to her daughter, Ann Guerra, who is the executrix of the estate. This would include the balance after debts and expenses of the estate in the joint and survivor accounts if the survivorship rights were voided by the appointment of the guardian for Mrs. Sziszak.

In view of the above facts, the executrix poses a series of questions and asks the direction of the court. In brief, the questions in slightly reworded form, are as follows:

1. Did the joint and survivorship accounts retain their identity in the hands of the guardian?

2. Should the "payable on death" account be treated the same as the joint and survivor accounts?

3. Should the guardian have paid her ward's expenses from particular accounts and left the others intact or should the expenses have been paid from the assets in the estate?

4. The same question is posed as to the duty of the executrix in the use of decedent's assets in settling the estate of the decedent.

5. Were the joint and survivor accounts and the "payable on death" account vested in the co-depositors so that they do not become a part of decedent's estate or do part or all of the funds represented by these accounts enure to the benefit of the legatee named in the residuary clause of decedent's will?

6. Does the money obtained from the sale of the real estate specifically devised to Joseph Sziszak retain its identity as real property?

7. If the answer to the above question is in the affirmative, what amount, if any of the expense of the sale should be deducted from the sale price?

8. What amount, if any, should be deducted from the sale price for the care of the ward in the guardianship?

9. What amount, if any, should be deducted from the sale price for the debts of the estate and the costs of administration?

The first question is whether the joint and survivorship accounts retained their identity in the hands of the guardian. In other words, did the appointment of a guardian completely terminate the contract between the original owner of the various accounts and the several co-depositors so that they no longer had a vested interest in the funds in said accounts. If the contract is terminated, then the funds remaining in the accounts at the death of the ward are a part of her estate and should be distributed pursuant to the decedent's will. It was so held in the case of *In re Webb,* 18 Ohio App. 2d 287. Conversely, if the contract of deposit is not terminated by the guardianship, then the co-depositors have a vested right to the funds and said funds should not be distributed as part of the estate. There is nothing in the evidence in this case to throw doubt on the competence of the contracting parties when the accounts were established as joint and survivorship accounts. There was no fraud perpetrated on Mrs. Sziszak by her co-depositors and no false information given her as to the effect of the contracts, hence there appears to be no reason for the court to indulge in any legal gymnastics to nullify her acts by invoking the euphonious sounding theory of "realities of ownership."

Until the decision by the Supreme Court of Ohio in the case of *Miller* v. *Yocum,* 21 Ohio St. 2d 162, Ohio Bar for March 9, 1970, great confusion had existed in Ohio as to the effect the appointment of a guardian had on a joint and survivorship bank account. The syllabus in this case reads as follows:

"Where a person, now deceased, created during her lifetime a joint and survivorship bank account for the benefit of the survivor, and the trial court finds that the deceased intended to create a joint and survivorship account, and the evidence and the record support that finding, the fact that the decedent, after she had created the account, was declared to be an incompetent and a guardian was properly appointed for her, does not, as a matter of law, terminate the joint and survivorship nature of the account."

This case establishes that the appointment of a guardian does not, as a matter of law, terminate a joint and survivorship account, contrary to the finding in the following cases: *Abrams* v. *Nickel*, 50 Ohio App. 500; *Ulmer* v. *Society for Savings*, 35 Ohio Law Abs. 525; *In re Webb*, 18 Ohio App. 2d 287.

On the other hand, the following cases had found that the joint and survivor rights are not terminated by the appointment of a guardian, to wit: *National City Bank* v. *Hewes*, 90 Ohio Law Abs. 372; *In re Estate of Jones*, 68 Ohio Law Abs. 282; *In re Estate of Volgeli*, 108 Ohio App. 371.

The decision of the Ohio Supreme Court is in accord with the text found in 62 A. L. R. 2d 1091, and as to survivorship rights at page 1100. The conclusion is stated as follows:

"Assuming that under circumstances and the applicable law, the surviving joint depositor would have been entitled to the balance of the account in the absence of any intervening incompetency of either joint depositor, it has been held or recognized that the fact that one joint depositor becomes incompetent does not destroy his survivorship rights, or those of the other depositors as the case may be."

If, by the question—"did the joint and survivorship accounts retain their identity in the hands of the guardian" is meant did the co-depositors retain their vested interest in the accounts, subject to the right of the guardian to use such part of the funds as were necessary for the care of *Miller* v. *Yocum case* is that the status of co-depositors is her incompetent ward, the answer under authority of the

not destroyed by the guardianship and the co-depositors do have a vested interest which becomes absolute upon the death of the original owner of the funds in said accounts.

If, on the other hand, the executor means to ask if each of the eight individual accounts preserve their identity, a different problem is presented. The evidence established that the guardian converted each of the accounts into her own name as guardian and then proceeded to exhaust three of the eight in the care of her ward. However, when she came to file her final account she disregarded the individual accounts and accounted for a total of $22,000 in one savings account and $1,493.30 in a checking account. As executrix, she filed her inventory for the same amounts. It is the opinion of the court that as between the various accounts, that each should be diminished proportionately and that the guardian does not have authority to exhaust one account and leave another untouched, so in that context the various accounts do not retain their identity. In *Miller* v. *Yocum* the court in its opinion at page 167 cited with approval several out of state decisions and said:

"By holding that the *guardian has no power to exercise the discretion of his ward* and withdraw all of the funds from the accounts, those courts held, by implication, that the appointment of the guardian did not *per se* terminate the joint and survivorship accounts." (Emphasis added.)

Since the guardian does not have the power "to exercise the discretion of his ward," the funds still retained their identity regardless of how the various accounts were intermingled or retained in their original form by the guardian and upon the death of the ward, the executor is bound to recognize the vested rights of all of the co-depositors in the funds turned over to her by the guardian. To proceed in this manner accomplishes for the ward and ultimately the decedent the result she set out to accomplish during competency. She might have proceeded differently had not incompetency intervened, but the guardian was not vested with authority to change the legal status of the ward's estate and the executor must take the assets into her hands subject to any incumbrances imposed by her de-

cedent or by the guardian for her care. The conclusion is, therefore, that regardless of the form in which the bank accounts were held by the guardian during guardianship, upon the funds being turned over to the executrix by the guardian, said funds do retain their identity so that the vested rights of the co-depositors can be preserved.

The next question propounded is whether the "payable on death" account should be treated the same or differently than the survivorship accounts. Both types of accounts are vested in the survivor upon the death of the creator of the accounts, the only difference being that in the joint and survivorship account, either co-depositor may withdraw funds during the lifetime of the other with whatever limitation may be imposed by the law as declared in the *Webb case, supra,* and others of similar import. Certainly, the rights of the beneficiary of the P. O. D. account are not as great as those of the survivorship account and therefore should not be given a more preferential treatment so far as the use of the funds by the guardian is concerned. The cou..t so holds.

The question is next submitted as to whether or not the guardian should have paid her ward's expenses from particular accounts and left the others intact as she did and also should the expenses have been paid from other assets in the guardianship estate and the bank accounts not invaded at all. The guardianship estate consisted of assets itemized above. In addition, the ward had some rental income until the house was sold, dividends from the U. S. Steel stock, and Social Security payments. To maintain her ward in a nursing home, the guardian used the above current income, the cash derived from the sale of the home and consumed three of the bank accounts one by one. It is the opinion of the court that the only duty the guardian had was to manage the assets of her ward to the maximum advantage of the ward. The guardian could quite properly have combined all of the accounts in one account or leave them in eight accounts as she did until the time came to turn the balance on hand over to the executrix. It would appear that she left them separate in order to avoid the loss of interest on the accounts. The use of funds from

one account or another or the combining of accounts did not destroy the vested rights of the co-depositors in what remained of the total fund in the hands of the executrix. The guardian should have and did so far as the court can observe use current income and the most available cash to maintain her ward. If she did commit an error, it is now too late to correct it, except for fraud, as her final account has been approved with no exceptions filed. Having turned the assets over to the executrix, it becomes the duty of the executrix to determine the proper distribution of the estate assets and this problem is discussed under other questions.

A question which was not asked but which must be resolved is whether or not the joint and survivor U. S. Savings Bonds should be treated the same as the bank accounts by the executrix. The right created by the purchaser of these bonds in the various co-owners is that of sole owner upon the death of the purchaser. However, had the guardian needed the funds for the care of the ward during her lifetime, no reason exists why the guardian should not have cashed the bonds for that purpose. In fact, the court can see no reason why the guardian could not have used the proceeds from the sale of the bonds instead of invading the bank accounts, had she so elected. It is therefore the opinion of the court that the executrix must charge against the joint owners of the bonds a proportionate part of the expense of maintaining the decedent so far as it was necessary to invade capital assets during the period of guardianship. Upon her death, the joint owners became entitled to said bonds subject to this incumbrance, the same as the co-depositors of the bank accounts.

The sixth question propounded asks whether or not the money arising from the sale of the real estate by the guardian retains its identity as real estate, having been specifically devised to a son, Joseph Sziszak. It is the opinion of the court that R. C. 2127.38(D) requires that all assets turned over by the guardian to the executrix upon Mrs. Sziszak's death, which are a part of the probabte estate be made liable to create a fund to replace the money derived from the sale of the real estate, to be treated by the execu-

trix as if it still existed as real estate. R. C. 2127.38(D) reads as follows:

"(D) In the case of a guardian of the person and estate, or of the estate only, of a mentally incompetent person, the remaining proceeds of sale must be considered for all purposes as real estate until such mental incompetency is removed, and on the death of such mentally incompetent ward before such mental incompetency is removed, such remaining proceeds shall pass and devolve to the same person or persons and in the same manner and to the same extent as the real estate sold would have passed and devolved had there been no sale * * *"

The seventh question is what amount of the expenses of sale should be deducted from the sale price. The guardian acted wisely in selling the property to prevent its deterioration. This she was required to do in the best interest of her ward and it is the opinion of the court that all of the expenses incidental to the sale should be deducted from the sale price. The guardian's account and statements of counsel indicate that the cost was $271.35 leaving a balance from the $6,000 sale price of $5,728.65.

The eighth question is what amount, if any, of the expenses for the care and support of the ward should be paid from this money. In the settlement of an estate, R. C. 2127.02 requires that personal property be first exhausted before real estate be sold to pay decedent's debts, but the court finds no such provision applying to a guadianship estate. See *Ginder* v. *Ginder,* 72 Ohio Law Abs. 277. In the absence of a positive provision preferring one type of asset over another in a guardianship it is the opinion of the court that the real estate here must bear its proportionate share of the decedent's expenses while living and that this fund be diminished in the same proportion as the bank accounts and savings bonds and any other asests in the possession of the guardian.

The ninth question is what amount, if any, of the debts, funeral expenses and cost of administration of the estate payable by the executrix should be paid from the proceeds of the land sale. The court has held above that after hav-

ing been charged with the payment of their proportionate part of the ward's expenses over and above income, and the restoration of the real estate fund, which was actually consumed for that purpose, the bank accounts and savings bonds go direct to the co-depositors or co-owners as the case may be. Therefore, they are not a part of the estate and cannot be charged with the debts and expenses of the estate. There is one exception which has not been mentioned before and that is the joint and survivorship checking account between Mrs. Sziszak and Ann in the amount of $969.96 according to the guardian's inventory. It was stated by counsel for Ann who acted both as guardian and executrix that this was a convenience account and that Ann claims no survivorship right in the account. If she did, this would be an appropriate occasion to invoke the "realities of ownership" theory. The above fund should be treated as cash in the guardianship estate.

Coming back to the question as to what part of the administration expense must be born by the real estate. Since the probate estate has been so materially reduced, the question may well arise as to whether the U. S. Steel stock which was specifically bequeathed or the real estate funds must first be consumed if there are not enough other assets. The court finds the following texts and cases applicable to the problem:

31 American Jurisprudence 2d, Executors and Administrators, Section 465, page 214:

"In the absence of a statute placing real estate on the same basis as personal estate in regard to its liability for the payment of the decedent's debts, and apart from a testamentary direction to the contrary, personalty is the primary asset for the payment of the debts of the decedent, which the personal representative must first exhaust before any resort can be had to the realty. The rule may be thus summed up: When the personalty is exhausted, the representative is entitled to subject the real estate to the payment of the debts of decedent, but when the personalty is sufficint for that purpose, he has no right to proceed against real estate."

22 Ohio Jurisprudence 2d, Executors and Administrators, Section 336:

"Subject to directions in a will or other instrument as to all debts or as to a particular debts, the order in which property of a decedent is applied to the payment of his debts and the debts of the estate is (1) intestate personalty (2) other personal property (3) intestate realty, and (4) other real property."

*Skinner* v. *Blackburn,* 4 Ohio C. C. 325, 2 Ohio C. D. 574:

"The personal estate is primarily liable for the debts of the decedent, unless by a will he has exonerated it from the payment of the same and imposed that burden upon the real estate."

*Ginder* v. *Ginder,* 72 Ohio Law Abs. 277:

Syl. 3. "The personal property of a decedent must be exhausted before the realty becomes liable for his debts."

While the above citations do not deal directly with the question of what property must first be used for the payment of debts of the decedent, where personal property is specifically bequeathed, it seems to be assumed by all that the personal property will first be exhausted. In the Ohio Jurisprudence text a specific bequest would fall in class two, while a specific devise falls in class four and class two must be exhausted before class four is touched. It is therefore the opinion of the court that the personal property, including the U. S. Steel stock, must first be exhausted before any of the remaining part of the funds arising from the sale of the real estate can be used to pay the debts of the estate and the cost of administration.

This conclusion will affect not only the disposition of the U. S. Steel stock but also personal property to satisfy the two minor bequests made in Items 2 and 3 of the will.

*Judgment accordingly.*