LEADER FEDERAL SAVINGS AND LOAN ASSO-
CIATION OF MEMPHIS v. ALLEN HAMILTON,
Adm'r of ANNIE WALLACE, Deceased, Appellant, and
RICHARD McKISSAC, by GEORGE W. GRIDER,
Guardian ad litem, Appellee. —330 S. W. (2d) 33.

Western Section at Jackson. March 17, 1959.

Rehearing Denied by Supreme Court October 2, 1959.

Certiorari Denied by Supreme Court September 3, 1959.

B. F. Jones, Adrian Lowenthal, Memphis, for appellant.

George W. Grider, Memphis, for appellee.

CARNEY, J. Allen Hamilton, as administrator of Annie Wallace, deceased, appeals from a decree of the Chancery Court adjudging the defendant, Richard McKissac, to be entitled, as cestui que trust, to the sum of $7,670.65 deposited by Annie Wallace, deceased, on January 23, 1957, in the Leader Federal Savings and Loan Association in Memphis, Tennessee, in an account styled "Annie Wallace Trustee for Richard McKissac."

Richard McKissac, aged 16, is not related to Annie Wallace but was reared by her as her son. Richard McKissac's mother died when he was about five years of age and his father, who was still living, "gave" Richard to Annie Wallace. No adoption proceedings were ever instituted.

Annie Wallace was 57 years of age at the time of her death on March 16, 1957.

For many years Annie Wallace, along with her husband, Simon Wallace, lived on a plantation owned by J. W. Sanders near Walls, Mississippi, some twenty-five miles south of Memphis. Annie and her husband were hard-working colored share croppers who saved their

money and purchased a farm containing 160 acres. Sometime during the fall of 1956 Annie Wallace and her husband became estranged, separated and Annie Wallace moved to Memphis, Tennessee, to live with or near her sister, Florence Brown, aged 63. Richard McKissac moved with her to Memphis. Annie Wallace and her husband, Simon Wallace, divided their property including the farm and Annie Wallace contracted to sell her one-half interest in the farm to her former landlord, J. W. Sanders, at a price of $8,000.

The deal with Mr. Sanders was consummated on January 22, 1957, and Annie received J. W. Sanders' check in the amount of $7,972.65 as the net proceeds of the sale of her one-half interest in the farm. Mr. Sanders, fearing that Annie Wallace, because of her limited education and limited business experience, might make improvident investment of the money, suggested to her that she invest the money in the Leader Federal Savings and Loan Association of Memphis, Tennessee. Annie Wallace followed his suggestion and on January 23, 1957, made a deposit of $7,670.65. The other $300 she obtained in cash to pay some bills and for her personal use.

When Annie presented the check of Mr. Sanders for deposit with Leader Federal she signed what is designated in the record as a "discretionary revocable trust." A blank form of the trust agreement approximately 6 by 4 inches printed on both sides was furnished by Leader Federal. The blanks were filled in by a clerk of Leader Federal, Miss Nona Minor, who testified as a witness but who had no recollection of the transaction.

We copy each side of said trust agreement in full as follows:

"Discretionary Revocable Trust Account No. 50772

(1) _____ Wallace _____ Annie _____ Trustee
(To be typed) (Surname) (First Name) (Middle Name)

(2) Richard McKissie Beneficiary

I hereby apply for membership and a_____
savings account in the

Leader Federal Savings and Loan Association of Memphis

and for the issuance of evidence of membership. A specimen of my signature is shown below and the association is hereby authorized to act without further inquiry in accordance with writings bearing such signature.

Signature /s/ Annie Wallace WH 68105 as Trustee
 Telephone Number

Street Address 214 Frank St. City and State Memphis, Tenn.

As Trustee for Richard McKissie Beneficiary

As specified in trust agreement on reverse side hereof.

Dated _____ nm

day of ―――――――――, 19―. Jan. 23 '57"

"Discretionary Revocable Trust Agreement

The funds in the account indicated on the reverse side of this instrument, together with earnings thereon, and any future additions thereto are conveyed to the trustee as indicated for the benefit of the beneficiary as indicated. The conditions of said trust are:

(1) The trustee is authorized to hold, manage, invest and reinvest said funds in his sole discretion; (2) The undersigned grantor reserves the right to revoke said trust in part or in full at any time and any partial or complete withdrawal by the original trustee shall be a revocation to the extent of such withdrawal; (3) In the event of the death of said

trustee, _____ is appointed successor trustee,

and in the event of his death _____ is appointed successor trustee or in the event no successor trustee is named herein or the successor or successors die or fail to act, the association named on the reverse side hereof is authorized to appoint a successor trustee, such successor trustees shall have the powers of the original trustee;

(4) This trust, subject to the right of revocation, shall continue for the life of the grantor and thereafter until the beneficiary is _____ years of age and then the proceeds shall be delivered to the beneficiary, if the age of the beneficiary is not specified this trust is for the life of said beneficiary and six months, and if not revoked within six months after the death of said beneficiary, the funds in said trust account shall be the property of the estate of said beneficiary; (5) The association in which such funds are invested is authorized to pay the same or to act in any respect affecting said account before or after the termination of this trust upon the signature of the trustee and has no responsibility to follow the application of the funds.

In this instrument the singular includes the plural and the masculine includes the feminine and the neuter.

This _____ day of ___Jan. 23 '57___ , 19 __ .

/s/ Annie Wallace Grantor"

---

At the time of the opening of the account Annie received the customary savings account book which showed the initial deposit of $7,670.65 on January 23, 1957. The caption and front page of said account book is as follows:

"Savings Account Book

Main Office
Leader Federal

Savings and Loan
Association
of Memphis"

"This Certifies that Acct. No. 50772

Annie Wallace, trustee for

Richard McKissie

214 Frank St., Memphis, Tenn.

(Above lines filled in in pen and ink)

"Holds a savings account representing share interests in Leader Federal Savings and Loan Association of Memphis, subject to its charter and by-laws, the rules and regulations for the Federal Savings and Loan System, and to the laws of the United States of America.

Leader Federal
Savings and Loan Association
of Memphis"

| " Date | Earnings | Withdrawal | Credits | Balance |
|--------|----------|------------|---------|---------|
| Jan. 23-57 | | | 5K*7,670.65 | **7,670.65 |
| Mar 11-57 | | D**670.65 | | **7,000.00 |
| | | | | " |

On March 11, 1957, just a few days before she died, Annie Wallace personally appeared at the Leader Federal Savings and Loan Association with her savings account book and withdrew, as she had a right to do, the sum of $670.65 leaving a net balance of $7,000 in her account. This withdrawal was duly entered in the savings bank book.

Annie Wallace died very suddenly and without warning on March 16, 1957, without a will, leaving Florence Brown as the next of kin though the record is not too complete as to her relatives. At the time of her death Annie Wallace planned to make her home permanently with her sister, Florence Brown, had promised to pay off some indebtedness owing by Florence Brown on her home and to make repairs in a total amount of approximately $2,700.

The savings bank book was found among her valuable papers. Shortly thereafter a controversy developed between Florence Brown as the alleged next of kin of Annie Wallace and Richard McKissac as to the ownership of the funds on deposit in the Savings and Loan Association. Simon Wallace was divorced from Annie Wallace in the courts of Mississippi just a few days before her death. Simon Wallace is making no claim to

the funds and testified as a witness for Richard Mc-Kissac.

On November 25, 1957, Leader Federal Savings and Loan Association filed a bill of interpleader in the Chancery Court of Shelby County making Allen Hamilton, administrator of Annie Wallace, and Richard McKissac party defendants. By consent the bill was sustained as a bill of interpleader and the sum of $7,210.07 was paid into court. The $210.07 represented dividends accrued on the net amount of $7,000 to the credit of Annie Wallace at the time of her death.

The court appointed Honorable George W. Grider of the Memphis Bar as guardian ad litem for Richard McKissac. An answer was filed averring that the trust agreement signed by Annie Wallace was valid and enforceable and that Richard McKissac as the beneficiary thereof was entitled to the full amount of said fund plus the dividends accruing thereon.

The defendant, Allen Hamilton, as administrator of Annie Wallace, filed an answer admitting the execution of the trust agreement by Annie Wallace but denying the validity thereof and insisting that Annie Wallace died intestate and that said funds on deposit with Leader Federal Savings and Loan Association belonged to Annie Wallace at the time of her death and that therefore, he, as administrator, was entitled to the same.

As to the alleged invalidity of the trust agreement we copy paragraph II of the answer of Allen Hamilton, administrator, as follows:

"Further answering this Defendant admits that a savings account with complainant was opened on

January 23, 1957, upon the investment of the sum of Seven Thousand Six Hundred Seventy and 65/100 ($7670.65) Dollars by The said Annie Wallace; that he admits that the said Annie Wallace, at the time of the opening of said savings account, executed a certain trust agreement and investment contract, but denies that the execution of said agreement had the effect of conveying said funds to herself as trustee for the benefit of Richard McKissie, but affirmatively avers that at the time of the execution of said trust agreement, the said Annie Wallace had no intention of establishing a trust for the benefit of the said Richard McKissie, or of establishing a trust for the use and benefit of anyone; that the said Annie Wallace, at the time of the execution of the alleged trust agreement, was advanced in years and had benefit of very little, if any formal education or training, and knew nothing of trust agreements or legal matters of any nature; that the said Annie Wallace was accompanied to the office of the complainant by one Amanda Nunnally, who encouraged the said Annie Wallace to place the name of another party on her bank account and that the said Annie Wallace entered into this trust agreement as a result of the counsel and advice of the said Amanda Nunnally and that it was the influence of the Amanda Nunnally which caused the said Annie Wallace to enter into the trust agreement alleged in the original bill, and not the will or desire of the said Annie Wallace so to do; that the said Annie Wallace could not read or write and was an illiterate person and therefore could not read or interpret the trust agreement which she signed; that the said Annie Wallace with-

drew sums of money from this account, that she discussed this money with her neighbors and spoke of her intentions for the use of the money and that she treated the money as her own and never spoke of leaving any part thereof to the said Richard McKissie;''

Mr. Sanders, the landlord, Simon Wallace and William McKissac, father of Richard, all testified that Annie Wallace had reared Richard McKissac as her own son and that she had shown by word and deed that she wanted Richard McKissac to have her property at her death.

Amanda Nunnally, colored, a close friend of Annie Wallace, testified that she went to Mississippi with Annie Wallace to consummate the sale of her land and also accompanied Annie Wallace to Leader Federal to make the initial deposit. Her account of the opening of the savings account is as follows:

"Q. On the morning you all went to the bank, I want you to tell exactly what happened and the transaction when you got to Leader Federal Savings and Loan Bank that morning. A. When we got to the bank that morning, she didn't know anything about attending to business, so she says, 'Amanda, I am going to put your name—(Interrupted)

"Q. I'm sorry; I didn't understand you. She didn't know anything about what? A. She didn't know about the transacting of business, you know. She says, 'I want to put your name on this bank book so you can come and draw my money out when I need it', and I say, 'Miss Annie, I have a farm in Mississippi and I have to go back and forth in Mississippi.' I says, 'Put the boy's name on the

bank book because he will be here in town and he can attend to your business for you.'

"Q. When you went into the bank, you went over to the teller's window, is that correct? A. Yes, sir, and the lady told us, 'You all got an account here,' and she says, 'No', so she says, 'You have got to go over to the side and open up a bank account.'

"Q. I will ask you to state whether or not when you went over to the desk where the lady directed you to go and talked with the person who interviewed you and Annie Wallace, state whether or not any discussion was had between Annie Wallace and the person representing Leader Federal regarding the type of account, that is, whether or not it was a trust agreement or whether she was going to put the money in there for any other purpose? A. This white lady didn't explain anything to Miss Annie Wallace. She says, 'How you come by all this money?', and she told her, 'I sold 80 acres of land, and I am going to fix my sister's house up and pay the mortgage, and she owes $2700.00 on the house, and I am going to pay her house off and fix it up good because I am going to live with her. Ain't but the two of us, and my sister is too old to be working', and the woman said, 'I wouldn't care if I had 80 acres', and she said 'When the weather breaks, I am going to have my sister's house fixed because it is raining in there', and the white lady says, 'Do you want to keep any out?', and she told her, 'Well, I want to keep out about $300.00', and the white lady fixed a check out for her to complete, and I taken her downtown and she bought her some clothes and

I taken her to the grocery store and she got, you know, something to eat, because she didn't have anything when she came from Walls.

"Q. Now when she presented the check to open the account, and the lady instructed her to endorse the check—A. She wanted me to write my name on there, and the white lady says, 'No, you have to sign your own name because she can't write your name on the check.' She says, 'You have to sign your own name', and she says, 'Well, I can't write so good', and she says, 'Well, do it the best you can; just scratch it on there anyway', and it taken her about 20 or 30 minutes to scratch her name on there, and she says, 'I got time to wait on you.'

"Q. You mentioned in your testimony that she had tremendous difficulty in writing her name? A. Yes, sir.

"Q. I will ask you to state whether or not in signing her name on the check, did she have the assistance of the lady at the bank or the ladies at the bank in spelling of the name? A. I 'hoped' her spell her name.

"Q. I mean by that, did somebody tell her what letter to put next? A. Yes, sir.

"Q. After one letter you told her the next letter to put down? A. Yes, sir.

"Q. She was unable to write it by herself without that assistance? A. That's right.

"Q. I will ask you to state whether or not after this transaction you had any other occasion to handle

any business matters for her? A. Yes, sir. She owed her lawyer $50.00 down in Hernando, Mississippi. I sent the $50.00 off for her lawyer, and the next week I taken her downtown from Goldsmith's to this mortgage place where she owed her note. I went up and got a statement how much her sister owed on the house so she could pay the house out, and the week before she died, she had employed me to take her and her sister down there so she could pay the house out, the week before she died.''

As to the attitude and feeling of Annie Wallace toward Florence Brown, Amanda testified as follows:

"Q. I will ask you to state whether or not at any time Annie Wallace made any statement of any intention about Richard?

"A. She spoke of Richard staying there with Miss Brown. She says, 'I know my sister will see after Richard and put him through school and take care of him, and I want Richard to stay right here with those children and help raise them'. Richard got to the place he didn't want to go to school. She had spoke about sending Richard back to his mother because he was getting hard-headed, and she had said, 'I am sending him back to Walls'.

The Chancellor held that the trust was valid and that said funds were not part of the estate of Annie Wallace and that Richard McKissac as the beneficiary of said trust was entitled to the benefit of said funds.

However, the Chancellor further held that under the terms of the trust agreement the complainant, Leader Federal Savings and Loan Association, had certain

responsibilities and duties cast upon it and set aside the order sustaining the bill of interpleader and required the Leader Federal Savings and Loan Association to remain as a party to the cause. A decree was entered sustaining the trust and adjudging Richard McKissac to be the beneficiary thereof but the court expressly reserved all questions concerning the administration of the trust under the terms of the agreement.

The appellant, Allen Hamilton, has filed assignments of error and a very forceful and convincing brief. Except for the recent case of Peoples Bank v. Baxter, 41 Tenn. App. 710, 298 S. W. (2d) 732, the writer would hold that the execution by Annie Wallace of the so-called "Discretionary revocable trust agreement" was an attempt by Annie Wallace to make a testamentary disposition of her property not in conformity with the statutory law of wills and therefore, void and unenforceable.

The Chancellor recognized the document to be testamentary in nature as shown by the following quotation from his finding of fact:

"As to the form of this trust instrument, the Court is of the opinion that it is a sort of left-handed will, when the conditions of the trust are considered. A will may be revoked at any time after it is written, but it takes effect, if valid, at death, if not revoked. By like token, Annie Wallace could have revoked this trust at any time by the very simplest procedure of withdrawing all funds, and by the slightly more complicated action of advising complainant to set up the funds in another manner. She did neither and by the terms of the trust, upon her death, they accrue to the benefit of the named beneficiary."

The employee of Leader Federal Savings and Loan Association who accepted the funds for deposit from Annie Wallace and opened the account for her apparently considered the "discretionary revocable trust" to be primarily a testamentary disposition of the funds of Annie Wallace. We base this statement on the following quotation from Mr. Grider, the guardian ad litem for the beneficiary, Richard McKissac:

"Mr. Grider: If Your Honor please, that is our case. Would Your Honor permit me at this time to state into the record what I hoped to show by the testimony of Nona Minor, whose testimony was excluded by Your Honor yesterday?

"The Court: Well, I guess you are entitled to put it in the record, Mr. Grider. The Court still feels it is incompetent, however.

"Mr. Grider: I am aware of that, if the Court please.

"The Court: But for the sake of the record, go ahead and make a statement about it.

"Mr. Grider: I offered proof and intended to show by the testimony of Miss Nona Minor that whenever anyone wishes to set up a discretionary revocable trust in the Leader Federal Bank, she makes certain they understand what a trust is, and in the event of the depositor's death, the money will go to the person named as beneficiary in the trust agreement; that she never knew of a single example in which she failed to do that; and that it was the custom at the bank for all employees so to do.

"That is our case, if Your Honor please.

"The Court: All right, you may proceed." (Tr. pp. 77-78)

We are not impressed with the testimony of Amanda Nunnally that Annie Wallace had Richard McKissac's name "put on the account" in order to assist her in withdrawing her funds from Leader Federal Savings and Loan Association. On the contrary, this court finds that Annie Wallace had very limited education, could barely write her name, but that she wanted the account entered in the bank in such a way that she could and would have full and complete charge of said funds during her lifetime and that whatever remained in said account at her death would go to her foster son, Richard Mc-Kissac.

We doubt that Annie Wallace had the educational background to read and understand the terms and provisions of the "discretionary trust agreement" which she signed but it is the opinion of this court that she relied upon the representations to her by the employee of Leader Federal Savings and Loan Association that the effect of said trust agreement was in conformity with her wishes, namely that she should have the full control of the account during her lifetime including the right to withdraw any part or all of the same and that whatever was left in said account at her death would become the property of Richard McKissac.

Under the terms of the trust agreement, Annie Wallace, the donor, retained full, complete, unlimited and unrestricted control of the trust fund up until the very moment of her death. She had the unrestricted prerogative to terminate said trust agreement in toto simply by withdrawing all of the funds at any time she desired

and expending them for any purpose she desired regardless of the wishes or welfare of the beneficiary, Richard McKissac. There is nothing in the trust agreement itself nor in the circumstances surrounding its execution to indicate that Annie Wallace intended to give Richard McKissac any more than an expectancy of receiving whatever was left in said fund upon the death of Annie Wallace.

We think the following quotation from the opinion of Presiding Judge McAmis in the case of Ferry v. Bryant, 19 Tenn. App. 612, 93 S. W. (2d) 344, 345, is very appropriate:

"(1-3) It is elementary that there can be no gift of personal property inter vivos absent complete and unconditional delivery of the article either directly to the donee or to a trustee to act as agent for the donee. If delivery to a third party is merely for the purpose of delivery to the donee, the gift is not completed until the subject of the gift is actually delivered to the donee, and until that is done the donor may revoke the authority of his agent to make delivery, and resume possession of the article. However, the rule is that where delivery is unconditionally made to a third person to act as agent or trustee for the donee, such delivery completes the gift. To constitute such a case the circumstances must show a full relinquishment of dominion over the property to the trustee for the purpose of the trust, so that the trustee shall not be the agent of the donor, but shall act for the donee. Marshall v. Russell, 93 Tenn. 261, 266, 267, 25 S. W. 1070; Chandler v. Roddy, 163 Tenn. 338, 43 S. W. (2d) 397; Fly v. Woods, 13 Tenn. App. 310."

However, it is interesting to note that the courts in other jurisdictions are divided as to the legality of trust agreements similar to the one executed by Annie Wallace in the present case.

One of the earlier leading cases is In re Totten, New York Court of Appeals, August 5, 1904, 179 N. Y. 112, 71 N. E. 748, 752, 70 L. R. A. 711, 1 Ann. Cas. 900.

In that case the court announced the following rule:

"A deposit by one person of his own money in his own name as trustee for another, standing along, does not establish an irrevocable trust during the lifetime of the depositor. It is a tentative trust merely, revocable at will, until the depositor dies or completes the gift in his lifetime by some unequivocal act or declaration, such as delivery of the pass book or notice to the beneficiary. In case the depositor dies before the beneficiary without revocation, or some decisive act or declaration of disaffirmance, the presumption arises that an absolute trust was created as to the balance on hand at the death of the depositor."

In the case of Nicklas v. Parker, 1907, 71 N. J. Eq. 777, 71 A. 1135, 14 Ann. Cas. 921, the New Jersey Court of Errors and Appeals held contrary to In re Totten. In the Nicklas case [69 N. J. Eq. 743, 61 A. 267, 268, 270] the donor, Ellen Cunningham, made deposits in a savings bank in the name of "Ellen Cunningham, Trustee for Honora Finerty." During her lifetime Ellen Cunningham retained full control of said account and made additions to and withdrawals from said account over a period of seven months. From said opinion we quote as follows:

"* * * Honora Finerty had no knowledge whatever of this account until after the death of Ellen Cunningham, and the latter never made any declaration to any one concerning the same; and the case is bare of any testimony or evidence respecting it, save that evidenced by the pass book itself. Ellen Cunningham kept this pass book in her own possession, and it was found among her effects at her death, and upon one occasion she made a draft upon this account for her own purposes. Since there was no contractual relation between these women, the account in controversy has no consideration to support it, and must be viewed as a pure gratuity. The allegations in the answer of Honora Finerty which would lead to a conclusion that there was consideration to support this account are not supported by any evidence whatever, and must have been made by counsel under a misapprehension of fact.

"This case presents the bald, bare question of the right to a chose in action arising from a deposit of the money of a depositor in a savings bank in the depositor's own name in trust for another. So far as my own research has resulted, and so far as that of counsel has furnished me with data, this is the first case presenting this unqualified question in this state. The right of the person named as cestui que trust to have the fund on deposit must rest upon one of the two theories; i. e., that it was a gift inter vivos by the depositor to her, or that it was a valid trust now enforceable by her. In either event the intention must be clearly proven, and such intention must be shown to have been carried into effect by the donor or settler. The nature and amount of proof

required, and the essentials to be proven, are similar with respect to each of the two necessary contentions. The form of the transfer and the time of enjoyment by the beneficiary may be different with respect to a trust, but there must be the same definiteness and clearness of proof of the completed execution of intention in the one case as in the other. It is clear that the depositor in this case did not intend to make a gift inter vivos to Honora Finerty of the money deposited. If she had intended to do this, she would either have deposited the money in the name of Honora Finerty, so that the latter could have drawn it at will, or, if she preferred to put it in the form of a trust, she would have vested Honora Finerty with power to draw immediately, or under conditions which she might specify, from the trust funds. Since, by the retention of the pass book, and the failure to disclose to Honora Finerty the existence of this account, and the failure to vest Honora Finerty with the power to draw upon it, the depositor retained in her own power complete dominion over the chose in action, it must be held that there is not sufficient evidence of a gift inter vivos. 'In order to legalize such a gift, there must be not only a donative intention, but also in conjunction with it a complete stripping of the donor of all dominion or control over the thing given.' Stevenson v. Earl, 65 N. J. Eq. 721, at page 725, 55 A. 1091, at page 1093, (103 Am. St. Rep. 790. Court of Errors and Appeals, 1903.) The depositor therefore must be held to have intended some other thing than a gift inter vivos. It is, in my judgment, equally clear that she did not intend to create a trust operative inter vivos. The

Court of Errors, (and Appeals,) in the case last cited, quotes the following language with approval: 'The one thing necessary to give validity to a declaration of trust—the indispensable thing—I take to be that the donor or grantor, or whatever he may be called, should have absolutely parted with that interest which had been his up to the time of the declaration; should have effectually changed his right in that respect, and put the property out of his power, at least in the way of interest.' The depositor in the case in hand did not so circumstance herself. By retaining the pass book, and refraining from disclosing to any one her intention with respect to the money deposited she retained complete dominion and complete interest.

\* \* \* \* \* \*

"I therefore conclude, in the case in hand, that there is no sufficient evidence of the intention of Ellen Cunningham that the money which she deposited in the bank in her own name in trust for Honora Finerty should be operative as an immediate gift inter vivos or as a trust inter vivos; and I further hold that if her intention was to retain complete dominion and control over the chose during her lifetime, and that it should pass to Honora Finerty at her death, such purpose was not effectuated in the only way in which it can be done under the laws of this state, because it was not done in accordance with the provision of the statute of wills.

"I will advise a decree that the sum of money in controversy belongs to the administrator of Ellen Cunningham, deceased."

In the recent case of Cohen v. Newton Savings Bank, 1946, 320 Mass. 90, 67 N. E. (2d) 748, 749, 168 A. L. R. 1321, the depositor signed a card bearing the following statement:

"This account I hold in trust, to control and dispose of as I see fit during my lifetime, but on my death to pay the beneficiary the full amount then standing to the credit of this account."

The account was opened on the books of the savings bank in the name of the depositor in trust for the named beneficiary. There was no delivery of the deposit book or bank book and the beneficiary had no knowledge of the existence of such bank account until after the death of the depositor. The Supreme Court of Massachusetts was of the opinion that since the declaration of trust was in writing it was valid.

In 164 A. L. R. at page 881, there is an annotation and collection of cases relating to the subject of testamentary character of trusts.

From Restatement of the Law of Trusts, Chapter 2, we quote Sections 57 and 58 as follows:

"Section 57. Disposition Inter Vivos Where Settlor Reserves Power to Revoke, Modify or Control.

"(1) Where by the terms of the trust an interest passes to the beneficiary during the life of the settlor, the trust is not testamentary merely because the settlor reserves a beneficial life estate or because he reserves in addition a power to revoke the trust in whole or in part and a power to modify the trust.

"(2) Where the settlor transfers property in trust and reserves not only a beneficial life estate and a power to revoke and modify the trust but also such power to control the trustee as to the details of the administration of the trust that the trustee is the agent of the settlor, the disposition so far as it is intended to take effect after his death is testamentary and is invalid unless the requirements of the statutes relating to the validity of wills are complied with.

"(3) Except as stated in Sec. 58, where the settlor declares himself trustee and reserves not only a beneficial life estate and a power to revoke and modify the trust but also power to deal with the property as he likes as long as he lives, the intended trust is testamentary."

"Section 58. Tentative Trust of Savings Deposit.

"Where a person makes a deposit in a savings account in a bank in his own name as trustee for another person intending to reserve a power to withdraw the whole or any part of the deposit at any time during his lifetime and to use as his own whatever he may withdraw, or otherwise to revoke the trust, the intended trust is enforceable by the beneciary upon the death of the depositor as to any part remaining on deposit on his death if he has not revoked the trust."

In the case of Miller v. Hubbs, 1955, 199 Tenn. 237, 285 S. W. (2d) 527, the account of $6,000 in the Home Federal Savings and Loan Association of Knoxville was in the name of Lucy Nora Hubbs and her brother-in-law,

Jesse L. Hubbs, heirs "joint tenants with the right of survivorship." The $6,000 had been deposited by Lucy Nora Hubbs and her brother-in-law, Jesse Hubbs, was made a joint tenant because of the close relationship between Jesse Hubbs and Arthur W. Hubbs, the deceased husband of Lucy Nora Hubbs. Upon the death of Lucy Nora Hubbs, the administrator of Lucy Nora Hubbs sought to recover the money. The Supreme Court held that the donor, Lucy Nora Hubbs, was of sound mind, free from influence of the grantee, Jesse L. Hubbs, and had competent advice from her deceased husband, Arthur W. Hubbs. We do not think this case is controlling of the case at bar because the deposit was in the name of Lucy Hubbs and Jesse Hubbs as joint tenants.

In the case of Peoples Bank v. Baxter, 1957, 41 Tenn. App. 710, 298 S. W. (2d) 732, 733, the subject of the controversy was a certificate of deposit issued by the Peoples Bank of Alamo, Tennessee. In that case the certificate of deposit issued by the Bank of Alamo was as follows:

"Alamo, Tenn. May 25, 1954

"This Certifies that Mrs. H. B. Baxter had deposited in this Bank Exactly $2040. and 00 Cts. Dollars payable to the order of Herself or payable on her death to Mrs. W. A. Nippers on the return of this Certificate May 25-55 after date properly endorsed.

"Glen Cates, Cashier."

Mrs. Baxter was the mother of Mrs. W. A. Nippers.

In the Baxter case Presiding Judge Avery of this court recused himself because his son and son-in-law were of counsel in the case. Judge Hickerson of the Middle Division of this court sat by interchange.

Argument was made in the Baxter case, as in the case at bar, that the gift to Mrs. Nippers was invalid because it was testamentary in nature. Judge Hickerson wrote the opinion for this court concurred in by Judge Bejach upholding the validity of the gift and expressly overruling the contention that said gift was testamentary in nature and therefore invalid. The writer of this opinion filed a dissent. The Supreme Court of Tennessee denied certiorari.

Reference is made to the collection of authorities in the dissenting opinion relating to the alleged invalidity of the gift because testamentary in nature. We can see no useful purpose to be served by repeating them again in this opinion. The writer is still of the opinion that such ought to be the law but concedes that such is not now the law in Tennessee.

Therefore, upon authority of Peoples Bank v. Baxter, supra, this court holds that the gift of Annie Wallace to Richard McKissac to take effect at her death is valid, though not in compliance with the statutes relating to the execution of wills.

The assignments of error are therefore respectfully overruled, a decree will be entered affirming the decree of the Chancellor and the cause will be remanded to the Chancery Court of Shelby County for construction and enforcement of the trust agreement. The appellant is taxed with the costs of this appeal.

Avery, P. J. (Western Section), and Bejach, J., concur.