IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT NASHVILLE

FILED

July 17, 1998

Cecil W. Crowson
Appellate Court Clerk

NOBLE NEAL KNIGHT, a non compos
mentis next friend and guardian,
FRED KNIGHT,

    Plaintiff-Appellee,

Vs.

    Marion Chancery No. 4712
    C.A. No. 01A01-9711-CH-00643

JAMES LANCASTER, Defendant
and MADGE BOGGILD,

    Defendant-Appellant.

FROM THE MARION COUNTY CHANCERY COURT
THE HONORBLE L. F. STEWART, CHANCELLOR

Charles R. Ables of South Pittsburg
For Juanita Knight, Successor to Fred Knight

Timothy R. Simonds;
McKoon, Billings & Gold, P.C. of Chattanooga
For Appellant, Madge Boggild

Jerry B. Bible of Jasper
For Guardian Ad Litem

*REVERSED IN PART, MODIFIED IN PART AND REMANDED*

Opinion filed:

**W. FRANK CRAWFORD,
PRESIDING JUDGE, W.S.**

**CONCUR:**

**DAVID R. FARMER, JUDGE**

**HOLLY KIRBY LILLARD, JUDGE**

This case involves a family dispute over the ownership of several bank and trust

accounts. Plaintiff/Appellee Noble Neal Knight (Brother) and Defendant/Appellant Madge

Boggild (Sister) are the brother and sister of Burma Lewis (Decedent), now deceased. After

completing the third grade in his teens, Brother held various jobs throughout his life; most notably he was involved in a farming partnership with his brother, Sam Knight. When Sam Knight died in 1972, the assets of the farming partnership were divided equally between Brother and Sam Knight's estate. Following Sam Knight's death, Brother, who was in his early sixties, decided to move in with Decedent at her residence in Marion County. When the Knight family farm was sold the following year, all of the Knight siblings, including the parties, each received $10,335.56 as their share of the proceeds.

Brother continued to live with Decedent until her death in 1981. Apparently, Brother's only sources of income at this time were payments from Social Security and paychecks from occasional jobs. At the time of her death, Decedent retained several bank and trust accounts at various lending institutions in Chattanooga. A detailed listing of the status of these accounts at the time of Decedent's death is attached to this Opinion as an Appendix. One of these bank accounts and three of these trust accounts are at issue in this appeal.

The three trust accounts at issue were originally opened in 1975 by Decedent as separate joint tenancy accounts, each listing Decedent or Brother as owners. Decedent closed these account in 1980 and transferred the funds to three new corresponding 21-year discretionary revocable trust accounts, each listing Decedent as trustee for Brother and/or Sister. These trust accounts were worth approximately $7,900, $6,600, and $18,000 at the time of Decedent's death.

The bank account at issue was originally opened in 1976 as a joint tenancy account, listing Decedent and Brother as owners.[1] In 1980 Decedent closed this account and transferred the funds to a new discretionary revocable trust account, listing Decedent as trustee for Brother or Henry Knight. Approximately three weeks before her death, Decedent closed this account and replaced it with a joint tenancy account, listing Decedent and Sister as owners. At the time of Decedent's death, this bank account had a balance of approximately $16,675.

After Decedent's death, Defendant James Lancaster[2], the successor trustee for the relevant trust accounts, managed these accounts. Lancaster withdrew the funds from each of the trust accounts and ultimately set up three corresponding new accounts listing himself as trustee

---

[1] Another sibling, Henry H. Knight, Sr., was subsequently added as a joint tenant in 1979.

[2] Lancaster is not a party to this appeal.

2

for Brother or Sister. With regard to the bank account, Sister drafted a letter to Lancaster, authorizing him to "change this account and set it up any way that he sees fit." Consequently, Lancaster withdrew the funds from the bank account and set up an account listing him as trustee for Brother. Lancaster subsequently closed this account and established a series of accounts listing Brother and Lancaster as co-owners. Ultimately these were transferred by Lancaster in 1982 to a bank account listing Sister as sole owner.

Shortly after Decedent's death, Brother moved to Alabama to live with his brother, Next Friend and Guardian Fred Knight, and sister-in-law, Juanita Knight. In 1982 an Alabama court appointed Fred Knight as legal guardian of Brother, who was 73 years old at that time. Later that year, Fred Knight, on behalf of Brother, filed this suit, alleging that the accounts at issue were invalid since some or all of the funds in the accounts were the personal property of Brother. After it was discovered that Fred Knight was himself adjudicated mentally incompetent by a Tennessee court in 1972,[3] Juanita Knight replaced her husband as primary plaintiff in this suit. Other family members were subsequently added as plaintiffs to this suit, and a Guardian ad litem was appointed to represent Brother.

Three and one half years after the case was tried, the trial court in 1989 entered an order in which it found that Decedent "took over" the finances of Brother, who the court reasoned was mentally incompetent to manage his financial affairs and, thus, did not have the requisite capacity to consent to the creation of the accounts established by Decedent. As a result, the trial court held that the bank account was the sole property of Brother and that the trust accounts were partially invalid since $18,632.70 of the funds in the trust accounts plus accrued interest was Brother's personal property. After the trial court denied a Motion for New Trial and Motion to Alter or Amend the Judgment filed by Sister, Sister timely filed a Notice of Appeal, but the Court of Appeals dismissed the appeal because the trial court had not entered a final judgment. The judgment was not made final until 1997, at which time Sister renewed her Notice of Appeal.

Sister presents five issues for review, as stated in her brief:

> 1. Whether the trial court erred in holding that $18,632.70 (plus accrued interest) of the funds contained in the trust accounts at issue in the litigation were the property of Noble Neal Knight.

---

[3] Consequently, Juanita Knight was appointed conservator of his estate.

3

2. Whether the trial court erred in holding that the funds contained in Bank Account No. 8-16-80177 (the successor account of Account No. 8-9-1216) were the property of Noble Neal Knight and not the property of Madge Boggild.

3. Whether the trial court erred in holding that Noble Neal Knight did not have the requisite mental capacity to consent to the creation of the trust accounts and other bank transactions at issue in this litigation.

4. Whether the trial court erred in holding that the trust accounts at issue in the litigation (which name Noble Neal Knight, Appellant and others as co-beneficiaries) were partially invalid as a matter of law.

5. Whether the trial court erred in denying the motion for new trial and motion to alter or amend the judgment filed by Appellant in this action.

Because of their interrelation, the issues will be considered together.

Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

The signature cards in the record demonstrate that Brother initially held an interest in all of the accounts at issue as a joint tenant with the right of survivorship. *See Lowry v. Lowry*, 541 S.W.2d 128, 132 (Tenn. 1976). In *Leffew v. Mayes*, 685 S.W.2d 288 (Tenn. App. 1984), the Court stated:

> Where funds are on deposit in a joint account with right of survivorship, we hold that during the lifetime of the joint tenants a rebuttable presumption arises that the parties own the money on deposit equally. *Kinkenon v. Hue*, 207 Neb. 698, 301 N.W.2d 77 (1981); *Craig v. Curtiss*, 64 Ohio App.2d 72, 411 N.E.2d 197 (1979); *Phillips v. Phillips*, 70 A.D.2d 30, 419 N.Y.S.2d 573 (1979); *McAulliffe v. Wilson*, 41 N.C.App. 117, 254 S.E.2d 547 (1979). As a consequence, upon a suit by one joint tenant against the other, the parties may prove the ownership of the funds that went into the account. *Craig v. Curtiss*, *supra*.
>
> Even though a joint tenant may withdraw the entire fund, one who does withdraw funds in excess of his moiety is liable to the other joint tenant for the excess so withdrawn. *Bricker v. Krimer*, 13 N.Y.2d 22, 241 N.Y.S.2d 413, 191 N.E.2d 795 (1963); *Austin v. Summers*, 237 S.C. 613, 118 S.E.2d 684 (1961); *Fecteau v. Cleveland Trust Co.*, 171 Ohio St. 121, 167 N.E.2d 890 (1960). A contractual agreement between the bank and the joint depositors does not conclusively determine the rights between the depositors during their lifetime. *Johnson v. Herrin*, 272 S.C. 224, 250 S.E.2d 334 (1978); *O'Hair v. O'Hair*, 109 Ariz. 236, 508 P.2d 66 (1973); *In re Webb's Estate*, 18 Ohio App.2d 287, 249 N.E.2d 83 (1969).
>
> We further hold that T.C.A., § 45-2-703, which absolves a bank of liability upon its payment to either joint tenant or the survivor, was enacted for the protection of the bank and does not affect the rights of the joint tenants, as

4

> between themselves, during their lifetime. *Keokuk Sav. Bank & Trust Co. v. Desvaux*, 259 Iowa 387, 143 N.W.2d 296 (1966); *Armstrong v. Daniel*, 88 Ill.App.2d 31, 232 N.E.2d 218 (1967).
>
> Based upon the foregoing authorities, we hold that during the lifetime of joint tenants (other than husband and wife) with right of survivorship, the funds deposited in such an account are held in divisible parts and, upon the death of one, the other takes the whole only by survivorship.

*Leffew*, 685 S.W.2d at 291.

In the instant case, the trial court's ruling that $18,632 (plus accrued interest) of the funds in the trust accounts belong to Brother implies that Brother successfully rebutted the presumption that the joint tenancy accounts were owned equally by the joint tenants. The record demonstrates that, with the exception of Social Security payments and various unspecified paychecks, Brother's assets were primarily derived from the following: (1) $4,009.72 as his share of his and Sam Knight's farming partnership bank account after Sam Knight died in 1972; (2) $913.40 as a portion of the proceeds from the sale of equipment and other assets of the farming partnership; (3) $2,733.36 as his share of proceeds of cattle sold by the partnership; (4) $640.72 as his one-ninth interest in Sam Knight's estate following his death; and (5) $10,335.56 as his share of the proceeds when the Knight family farm was sold in 1973.[4] These sums total $18,632.76. The trial court found that Decedent "took over all of Neal Knight's money" once he moved in with her. The trial court proceeded to charge the Decedent with this sum, $18,632.76, plus interest, and rule that the sum shall be deducted from all of her trust accounts and that the 21-year trusts are null and void with regard to Brother's funds. The trial court neglected to specify the exact amounts which should be deducted from each account.

Although there is evidence that suggests that Decedent handled Brother's financial affairs, the trial court's ruling with regard to the trust accounts is not supported by a preponderance of the evidence. At trial, the plaintiff failed to show that any of Brother's personal funds are directly traceable to any of the accounts at issue in this appeal. Terry W. Gentle, a certified public accountant, testified at trial based on his preparation of a "Summary of Transactions and Signature Cards at Financial Institutions Involving Noble Neal Knight from 1972 through April 4, 1985." Gentle testified that the report was compiled without knowledge of the sources of the deposits into any of the accounts. There is absolutely no evidence, such as

---

[4] Each of the Knight siblings received this sum after the farm was sold.

5

deposit slips or canceled checks, that reveal Brother's funds being deposited into any of the accounts at issue.

Instead, the plaintiff presented circumstantial evidence in an attempt to link the aforementioned sums of money received from Brother with the accounts. For instance, First Federal Trust Account No. C-45764 (See Appendix), which existed at the time of Decedent's death, was originally a bank account opened in 1972 as a joint tenancy account owned by Brother and Hugh Knight with an initial deposit of $4,009.07. Indeed there is a correlation between this initial deposit and Brother's receipt of $4,009.72 as his share of the farming partnership account. Sister, however, does not claim an interest in this account on appeal. The trial court also noted that the predecessor to Interfederal Trust Account No. 215795-10 was opened in 1977 with an initial deposit of $10,355.56. Certainly, there is a correlation between this sum and Brother's receipt of $10,355.56 as his share of the proceeds from the sale of the Knight family farm. This deposit, however, was made more than three years after Brother received his share of the proceeds, and it is undisputed that Decedent also received the identical sum as her share of the proceeds. Thus, it is conceivable that this deposit could reflect Decedent's share of the proceeds from the family farm. Nevertheless, Sister, on appeal, does not challenge the application of the trial court's order to this account.

These two deposits are the *only* evidence in the record that conceivably link Brother's funds to any of the accounts. The record also includes a copy of the $640.72 endorsed check made out to Brother from Sam Knight's estate. A stamp on the back of the check indicates that the check was deposited with Chattanooga Federal Savings & Loan Association, predecessor to Interfederal Savings & Loan, in 1974. The account into which the check was deposited is not discernible, and there is no evidence that clearly demonstrates that these funds were eventually deposited into any of the trust accounts at issue. In fact, Gentle's report indicates that in the period that Brother would have accumulated the aforementioned sums of money, 1972 thru 1974, the only account that existed was a First Federal Savings & Loan account,[5] an account that is not at issue in this appeal. Furthermore, it is noteworthy that the trial court's holding presupposes that Brother did not spend *any* of the $18,632.76 during the ten years that he lived

_____

[5] See Account No. C-45764 in the Appendix for a history of this account.

with Decedent.

Without explaining its reasoning, the trial court also held that the bank account at issue was Brother's property.[6] The law and the facts do not support such a finding. The bank account was originally opened in 1976 as a joint tenancy account owned by Decedent, Brother, and Henry H. Knight, Sr., with an initial deposit of $1,517.27. There is no evidence that any funds deposited into this account or to any of the successors to this account are traceable to brother.[7]

Notwithstanding this lack of evidence, the trial court's ruling may, nevertheless, be upheld, at least in part, if the record demonstrates that Decedent withdrew funds from the joint tenancy accounts in excess of her moiety. *Leffew*, 685 S.W.2d at 291. Since there is no evidence in the record tracing the source of the deposits into the accounts at issue, we presume that each joint tenant held an interest in the accounts in equal proportion. *Id.* In *Estate of Haynes v. Braden*, 835 S.W.2d 19 (Tenn. App. 1992), the Court considered whether a joint tenancy account contract established the intent to confer complete control of funds of the account to the other joint tenant. In that case, Haynes established two joint tenancy bank accounts with right of survivorship with his nephew-defendant. Shortly before Haynes's death, his nephew withdrew all the funds. After Haynes' death suit was filed on behalf of his estate to recover the funds. The signatory cards for the contracts at issue included the following language:

> *It is agreed by the signatory parties with each other* and by the parties with you *that any funds placed in or added to the account by any one of the parties* **are and shall be conclusively intended to be a gift and delivery at that time of such funds to the other signatory party or parties to the extent of his or their pro rata interest in the account.** (Emphasis added).

*Id.* at 20-21. Contrasting the case from *Leffew*, *supra*, the Court found for the defendant and held that:

> [c]learly the contract between the parties which was created by the account agreement authorized and empowered the defendant to withdraw the funds at any time and "conclusively" established a gift together with delivery.

*Id.* at 21; *see also In re Hawn v. Melton*, No. 03A01-9308-CH-00285, 1993 WL 516245 (Tenn. App. Dec. 15, 1993).

---

[6] Brother's brief suggests that this ruling was based on "fairness and equity under the totality of [the] circumstances."

[7] In his brief, Brother argues that the trial court's finding with regard to the bank account can be justified by the theory of constructive trust. A party that neglects to raise an issue before the trial court is barred from raising the issue for the first time on appeal. *Simpson v. Frontier Community Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991); *Stewart Title Guar. Co. v. F.D.I.C.*, 936 S.W.2d 266, 270 (Tenn. App. 1996). This principle applies to claims of constructive trusts. *Holt v. Lovelace*, Jefferson Chancery No. 45, 1986 WL 7610, at *1 (Tenn. App. July 9, 1986). Since Brother did not argue this issue before the trial court, he may not raise the issue on appeal.

In the present case, the joint tenancy contracts for the accounts at issue contain the identical language that was present in *Braden*. Therefore, Decedent was seemingly authorized to unilaterally withdraw all of the funds in the joint tenancy accounts and create new accounts. With regard to the bank account at issue, First Federal Account No. 8-9-1216, it would appear that Decedent retained the right to unilaterally close the predecessor trust account that listed Decedent as trustee for Brother or Henry H. Knight, Sr.. The Discretionary Revocable Trust Agreement for this account expressly states that "[t]he undersigned grantor [Decedent] reserves the right to revoke said trust in part or in full at any time . . . ." Consequently, Decedent did not breach the contract or act unlawfully by terminating the trust on May 7, 1981, and transferring the funds to a joint tenancy account listing Decedent and Sister as owners. *See Leader Fed. Sav. & Loan Assoc. v. Hamilton*, 46 Tenn. App. 368, 382-83, 330 S.W.2d 33, 40-41 (1959). The signature card for the succeeding joint tenancy account expressly granted Sister the right of survivorship. Therefore, Sister was the sole owner of the funds in the account following Decedent's death and was free to use the funds as she saw fit. *Lowry v. Lowry*, 541 S.W.2d 128, 132 (Tenn. 1976).

However, case law indicates that Sister's actions closing the joint tenancy accounts would not be authorized in the event that Brother did not have the requisite mental capacity. *See Lowry*, 541 S.W.2d at 133; *Braden*, 835 S.W.2d at 21; 10 Am.Jur.2d *Banks & Financial Institutions* § 678 (1997); Annotation, *Effect of Incompetency of Joint Depositor upon Status and Ownership of Bank Account*, 62 A.L.R.2d 1091 (1958). In its Memorandum Opinion, the trial court found that Brother was "incapable of handling his own affairs," and stated:

> Factually Noble Neal Knight had a difficult time in school. He never learned to read or write, except to sign his name, nor did he ever learn any mathematics. He says he can't make change and has had to depend upon some member of the family to help him all his life. He can't dial a phone. He had worked for T.V.A. as a laborer. He did have a job as a night watchman at a coal mine but lost it after a short time. He does and has drawn a monthly check for several years. He says he had difficulty remembering things. He did learn to drive a truck though other witnesses felt he was a dangerous driver. The Psychiatrist, Dr. Phillip Curtis Sottong, examined him and found him to be retarded with a probable IQ of around 75 to 80. He also has a disorder of functionary intelligence. In old laymen terms he is a moran [sic], i.e., he must have supervision at whatever he does.

Therefore, the trial court stated:

> As to the various cards signed by the Trustees and the parties it is argued that they vest titles, etc. but they can have no effect upon this case since the funds were Neal Knights [sic] to begin with and he could not give his consent, being a non compos.

As stated earlier, the aspect of the trial court's finding that Brother owned all of the funds in the accounts at issue is flawed. Our next inquiry concerns whether the trial court erred in determining that Brother could not give his consent

to Decedent's actions because he was mentally incapacitated.

The party attempting to invalidate a contract based on the theory of mental incapacity bears the burden of proof. *Williamson v. Upchurch*, 768 S.W.2d 265, 269 (Tenn. App. 1988). In *Roberts v. Roberts*, 827 S.W.2d 788 (Tenn. App. 1991), the Court quoted approvingly the following language from C.J.S.:

> The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the act or transaction in which he is engaged; the law does not gauge contractual capacity by the standard of mental capacity possessed by reasonably prudent men. It is not necessary to show that a person was incompetent to transact any kind of business, but to invalidate his contract it is sufficient to show that he was mentally incompetent to deal with the particular contract in issue, ...
>
> On the other hand, to avoid a contract it is insufficient to show merely that the person was of unsound mind or insane when it was made, but it must also be shown that this unsoundness or insanity was of such a character that he had no reasonable perception or understanding of the nature or terms of the contract. The extent or degree of intellect generally is not in issue, but merely the mental capacity to know the nature and terms of the contract.
>
> While the mental incapacity which will render one incapable of contracting need not be so great as entirely to dethrone the reason, and imbecility or weakness of mind to a degree destroying one's capacity to understand and protect his own interests will avoid his contract, there must, to invalidate the contract, be at the time thereof such impairment of reasoning powers as to make the person incapable of acting rationally in the transaction involved, or such mental unsoundness as occasions an inability to comprehend the subject of the contract and its nature and probable consequences, or as renders the individual incapable of understanding and acting with discretion in the business at hand; and it has been held that to invalidate his contract there must be an entire loss of a person's understanding as respects such transaction.
> In the final analysis, contractual capacity is a question to be resolved in the light of the facts of each case and the surrounding circumstances.

*Roberts*, 827 S.W.2d at 791-92 (quoting 17 C.J.S. *Contracts* § 133 (1)(e)).

The proof demonstrates that Brother supported himself with various jobs for over fifty years. Brother had a driver's license and owned and drove his own truck.[8] Although he was capable of cooking for himself and washing his own clothes, Brother apparently only performed such chores on rare occasions. Testimony reveals that Brother could not read or write and had trouble dialing the telephone. Although Brother often carried his own money and understood simple mathematics with regard to financial transactions,[9] it is clear that he entrusted his financial affairs to others throughout his life. At trial, when questioned by the Guardian ad litem, Brother testified as follows:

> Q. Let me ask you this. During any last years, well, let's just say all of your life here, have you ever taken care of your own bank accounts?

---

[8] Family members, however, testified that Brother was a poor driver.

[9] Brother was capable of making change only for very simple transactions.

A. No, sir.

Q. Do you know how a bank operates?

A. No, sir.

Q. As far as the customers?

A. Well, all I know is you go in there and if you've got a check you can cash it if it's good, if it ain't they check your account is all I can say. I've had that happen.

Dr. Phillip Sottong, a psychiatrist, testified in a deposition based on a fifteen to twenty minute examination of Brother in 1982. Although Dr. Sottong was uncertain of whether Brother's mental capacity deteriorated as he got older, he opined that Brother likely had a limited intelligence his entire life. Dr. Sottong's deposition includes the following interchange between the psychiatrist and counsel for Brother:

Q. To what extent, in your opinion, do you think that this individual could enter into any type of agreement and him fully comprehend or understand it?

A. On the basis of that exam, if it was an agreement involving money I doubt that this man could comprehend it.

Q. Do you have an opinion, based on your observations of this man, as to where he would be chronologically as to an average child or whatever?

A. I'd give him around 8 or 9 year old child [sic].

Q. Based also on your observations and your opinion that have been arrived from that, to what extent do you think he has the ability to understand maybe the ramifications of signing bank papers or anything of that nature which might change accounts, bank cards, or any of that?

A. I think his judgment is based purely on trust and that if you smiled at him and were a nice guy and he trusted you and he looks like the kind of person who thinks best of his fellow man, and if you were, I'd say you could be the world's greatest crook and if you were nice he'd probably trust you and do whatever you said and so I think the problem there is how good his judgment is and whom he trusts. I don't think he has the capacity to formulate what's really going on in terms of what decisions are being made all about.

When questioned by counsel for Sister, Dr. Sottong elaborated:

He does not comprehend numbers. Therefore, the most I can say on the basis of my examination is that he is not competent to enter into a contract so far as numbers are concerned and that is the extent that I can say whether he's competent or not competent based on my examination.

Although Dr. Sottong did not conduct a formal IQ test, he estimated that Brother's IQ is between 75 to 80 based on his evaluation.

Sister contends that Dr. Sottong's evaluation does not provide material evidence concerning whether Brother retained the requisite mental capacity to enter into the specific transactions at issue in this case. Sister asserts that even

if Brother does not adequately comprehend numbers, he may, nevertheless, competently understand the notion of joint bank accounts and, thus, be able to consent to Decedent's transactions.[10] Citing *Woods v. Mutual of Omaha*, No. 02A01-9510-CV-00218, 1996 WL 578489 (Tenn. App. Oct. 9, 1996), Sister argues that Dr. Sottong's testimony is irrelevant because it only renders an opinion of Brother's capacity *after* the transactions at issue occurred.

In *Woods*, the plaintiff challenged the validity of a settlement release agreement entered into between the plaintiff and the defendant on the basis of the plaintiff's alleged mental incapacity. The plaintiff proffered the affidavit of a psychologist, who testified:

> [Plaintiff] first came to me on April 6, 1992 [approximately two weeks after the release was executed] presented with paranoia, psychotic thinking, numerous somatic complaints, and extreme anxiety.
>
> He has received a diagnosis of Schizophrenia, Paranoid type. . . .
>
> It is my opinion that, due to his mental state at that time, he was not capable of entering into a contract with full knowledge and ability to understand the consequences of that contract.

*Id.* at *1. Granting summary judgment to the defendant, the Court found this affidavit to be "inadequate," since it "refers only to [the plaintiff's] general inability to enter into a contract and does not make specific reference to the contract at issue." *Id.* at *3.

We find *Woods* to be inapposite to the case at hand. In the instant case, Dr. Sottong testified as follows:

> The problem I would have here in terms of this man would be you'll see many people from 70 on up who will show the same factor who may have been formerly brighter people and where there's enough arteriosclerosis to create the same condition, so that in this man I don't know enough about his earlier history to know whether this has been a lie [sic] long thing or whether this is merely something that he has developed in age now. His concept is that for 25 years he had not been able to handle money or know what to do with it and therefore my assumption is that this is not arteriosclerosis, that this is rather just a limited intelligence that he functions with.

Standing alone, Dr. Sottong's deposition, indeed, would appear to be insufficient evidence of Brother's mental capacity at the time of the transactions at issue. However, when coupled with the other evidence presented at trial, sufficient evidence existed by which the trial court could make a finding that Brother did not have the requisite capacity at the time the transactions were executed.

Faced with factual circumstances similar to the case at hand, the Court in *Roberts, supra*, stated:

> Even when no opposing expert testimony is offered, the trier of fact is still bound to decide the issue upon its own fair judgment assisted by expert testimony. *Gibson v. Ferguson*, Tenn. 1976, 562 S.W.2d 188.

---

[10] Sister's also stresses that Dr. Sottong's opinion was based on a single evaluation of Brother that lasted for only 15 to 20 minutes.

> Even though the finding of the Trial Court does not explicitly state that the deceased was fully competent to execute instruments of the character here involved, this Court finds upon de novo examination of the evidence that he was so competent.

*Roberts*, 827 S.W.2d at 795; *see also England v. Burns Stone Co., Inc.*, 874 S.W.2d 32, 38 (Tenn. App. 1993). The sources of incapacity alleged in *Woods*, "paranoia, psychotic thinking, numerous somatic complaints, and extreme anxiety," *Woods, supra,* at *1, are more prone to be temporary and not life-long. In contrast, the source of Brother's alleged incapacity is a low intelligence, a trait that is certainly more prone to be life-long. In fact, the evidence presented at trial is consistent with the finding that Brother has suffered from a diminished mental capacity throughout his life. Therefore, the trial court did not err in considering Dr. Sottong's deposition testimony.

The preponderance of the evidence supports the trial court's finding that Brother did not have the requisite mental capacity to consent to the transactions at issue. An agglomeration of all of the proof presented at trial demonstrates that Brother satisfied his burden of proving that he was mentally incapable of consenting to Decedent's actions. *See Roberts*, 827 S.W.2d at 792-95. Such a finding is most notably supported by testimony from numerous family members that Brother has been mentally "slow" his entire life and has relied on others to handle his finances.

While the trial court reached the right conclusion concerning Brother's mental capacity, we differ with the result reached by the trial court. Accordingly, the trial court's ruling is modified as follows:

Due to Brother's incapacity, Decedent's termination of Interfederal Bank Accounts No. 27338-10, No. 28464-10, and No. 74274-10 and subsequent transfer of these funds to Interfederal Trust Accounts No. 31013-10, No. 31014-10, and No. 215795-10 respectively are null and void to the extent of one-half of the funds transferred. Account No. 27338-10 was worth $7,520.55 at the time that it was closed. Because it is presumed that half of the funds were owned by Brother, *Leffew*, 685 S.W.2d at 291, Brother is entitled to $3,760.28. Since Account No. 28464-10 was worth $6,217.03 at the time that it was closed, Brother is entitled to $3,108.52 for this account, and since Account No. 74274-10 was worth $17,936.98 at the time that it was closed, Brother is entitled to $8,968.49 for this account. Brother is also entitled to the account interest for the funds awarded from the date of transfer, June 6, 1980, until the funds are restored to Brother. The remainder of the funds that were transferred from these accounts shall continue to be held in accordance with Decedent's specifications and the trial court's ruling is reversed to the extent that the successor accounts to any of these trust accounts are declared null and void.

The origin of the Bank Account at issue, First Federal Account No. 8-9-1216, was Account No. LS-97, and was jointly owned by Decedent, Brother and Henry H. Knight, Sr.. Since Brother is entitled to his one-third pro rata

share of the $11,880.72 value of this account at the time that it was closed by Decedent,[11] the trial court's ruling is modified so that Brother is owed $3,960.24 plus account interest for the period mentioned above. The remainder of the sums in this account were permissibly transferred to Trust Account No. 8-9-1032, listing Decedent as trustee for Brother or Henry H. Knight, Sr.. Pursuant to the terms of the Discretionary Revocable Trust Agreement, Decedent was entitled to revoke the agreement before her death and transfer the funds to Account No. 8-9-1216, listing Decedent and Sister or joint tenants.[12] *Hamilton*, 46 Tenn. App. at 382-83, 330 S.W.2d at 40-41. Thus, Sister, as surviving joint tenant, was entitled to the remainder of the sums in this account at the time of Decedent's death. *Lowry*, 541 S.W.2d at 132.

Since these are the only accounts raised on appeal, we do not alter the trial court's ruling to the extent that it applies to the other accounts not raised on appeal. All other issues on appeal are pretermitted by this holding.

The judgment of the trial court is reversed in part, modified in part and remanded. On remand, the trial court shall determine the exact amount due Brother consistent with this Opinion. Costs of the appeal are assessed equally to both parties.

_____
**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

_____
**DAVID R. FARMER, JUDGE**

_____
**HOLLY KIRBY LILLARD, JUDGE**

---

[11] There is no dispute that Brother did not have capacity to consent to the addition of Henry H. Knight, Sr.'s name on the signatory card in 1979 and, thus, we calculate his pro rata interest as one-third of the account and not one-half of the account.

[12] Brother cites no authority for the proposition that a revocable trust may not be revoked in the event that a beneficiary is incapacitated.